05-2603-cv
Fund for Animals v. Kempthorne

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2007

(Argued: November 9, 2007         Decided: August 14, 2008
                    Errata filed: September 18, 2008)

Docket No. 05-2603-cv

---------------------------------------

THE FUND FOR ANIMALS, HUMANE SOCIETY OF THE UNITED STATES,
DEFENDERS OF WILDLIFE, ANIMAL RIGHTS FOUNDATION OF FLORIDA,
DONALD FEARE, GUSTAV W. VERDERBER, JULIE BAKER, KRISTI GHOLSON,
COLLETTE ADKINS GIESE, MARIAN PROBST,

Plaintiffs-Appellants,

- v -

DIRK KEMPTHORNE, Secretary of the Interior, H. DALE HALL, Fish
and Wildlife Service Director, CHUCK CONNER, Acting Secretary of
Agriculture, and CINDY SMITH, Administrator of the
Animal and Plant Health Inspection Service,

Defendants-Appellees.

---------------------------------------

Before:   McLAUGHLIN, CABRANES, and SACK, Circuit Judges.

Appeal from a judgment of the United States District Court for the Southern District of New York (P. Kevin Castel, Judge) granting the defendants' motion for summary judgment and dismissing plaintiffs' claims challenging the defendants' Public Resource Depredation Order, 50 C.F.R. § 21.48, as a violation of treaty obligations and federal statutes.

Affirmed.

KIMBERLY D. OCKENE, Meyer Glitzenstein & Crystal (Howard M. Crystal, Eric R. Glitzenstein, Meyer Glitzenstein & Crystal, Washington, DC; and Leonard D. Egert, Amy Trakinski, Egert & Trakinski, New York, NY, of counsel), Washington, DC, for Plaintiffs-Appellants.

SARAH S. NORMAND, Assistant United States Attorney (Michael J. Garcia, United States Attorney for the Southern District of New York, and Sara L. Shudofsky, Assistant United States Attorney, of counsel), New York, NY, for Defendants-Appellees.

SACK, Circuit Judge:

The plaintiffs appeal from a judgment of the United States District Court for the Southern District of New York (P. Kevin Castel, Judge), which, among other things, dismissed on a motion for summary judgment their claims challenging the Public Resource Depredation Order, 50 C.F.R. § 21.48 (the "Depredation Order"), on the grounds that it violates treaty obligations of the United States and federal statutes. We consider on appeal whether the defendants issued the Depredation Order in compliance with the Migratory Bird Treaty Act ("MBTA"), 16 U.S.C. § 703 et seq., the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et seq., and international treaties relating to the treatment of migratory birds to which the United States is a party.

**BACKGROUND**

The plaintiffs are individuals who, and organizations whose members, derive pleasure from observing water birds known

2

as double-crested cormorants ("cormorants") in their natural habitat.  These birds are not protected by the Endangered Species Act, 16 U.S.C. § 1531 et seq., but their treatment is regulated by international treaties to which the United States is a party, and by federal statutes and regulations.  The Fish and Wildlife Service ("FWS") has been delegated primary responsibility for regulating migratory birds, including cormorants.  See Migratory Bird Permits; Regulations for Double-Crested Cormorant Management, 68 Fed. Reg. 12,653, 12,653 (Mar. 17, 2003).

The plaintiffs brought this action to challenge the Depredation Order, which, they allege, violates the relevant treaties and statutes by "authoriz[ing] state fish and wildlife agencies, Indian Tribes, and U.S. Department of Agriculture . . . employees to kill an unlimited number of federally protected double-crested cormorants in New York and twenty-four other States, without any restrictions on time of year or location of the killings, without any advance notice to the FWS, and without any showing of specific, localized harm caused by the cormorants."  Compl. ¶ 1.

Because they are migratory birds, cormorants regularly cross national boundaries.  Prior to 1916, the treatment of these birds was regulated by individual nations within their own borders, making it difficult for any individual country to protect their populations from over-hunting or other harm.  In order to create a "uniform system" for migratory birds that passed through their territories, the United States in 1916

negotiated a treaty with the United Kingdom, acting on behalf of Canada, to coordinate protection of certain bird populations. See Convention Between the United States of America and the United Kingdom of Great Britain and Ireland for the Protection of Migratory Birds in the United States and Canada, U.S.-Gr. Brit., Proclamation, Aug. 16, 1916, 39 Stat. 1702 ("U.K. Convention"). Similar treaties were later entered into by the United States with Mexico in 1936, Japan in 1972, and the Soviet Union in 1976. See Convention between the United States of America and the United Mexican States for the Protection of Migratory Birds and Game Mammals, U.S.-Mex., Feb. 7, 1936, 50 Stat. 1311 ("Mexico Convention"); Convention between the Government of the United States of America and the Government of Japan for the Protection of Migratory Birds and Birds in Danger of Extinction, and Their Environment, U.S.-Japan, Mar. 4, 1972, 25 U.S.T. 3329; Convention between the United States of America and the Union of Soviet Socialist Republics Concerning the Conservation of Migratory Birds and Their Environment, U.S.-U.S.S.R., Nov. 19, 1976, 29 U.S.T. 4647. Each of these treaties lists the birds that are protected under its terms. Only the Mexico Convention, as amended in 1972, explicitly applies to cormorants.

The original 1936 Mexico Convention provides, in pertinent part:

> ARTICLE I. In order that the species may not be exterminated, the [United States and Mexico] declare that it is right and proper to protect birds denominated as migratory . . . by means of adequate methods which will permit, in so far as the respective high

4

contracting parties may see fit, the utilization of said birds rationally for purposes of sport, food, commerce and industry.

ARTICLE II. The [United States and Mexico] agree to establish laws, regulations and provisions to satisfy the need set forth in the preceding Article, including:

A) The establishment of close seasons, which will prohibit in certain periods of the year the taking of migratory birds . . . .

. . .

C) The limitation of their hunting to four months in each year, as a maximum, under permits issued by the respective authorities in each case.

D) The establishment of a close season for wild ducks . . . .

. . .

ARTICLE IV. . . . [T]he following birds shall be considered migratory:

Migratory game birds. . . .

Migratory non-game birds. . . .

Mexico Convention, arts. I, II, IV, 50 Stat. at 1312-14. The 1972 amendments to the Mexico Convention added the cormorant family of birds, but did not specify whether it was a game or non-game bird. See Agreement between the Government of the United Mexican States and the Government of the United States of America Amending Article 4 of the Convention for the Protection of Migratory Birds and Game Mammals, Signed at Mexico City on February 7, 1936, U.S.-Mex., Mar. 10, 1972, 23 U.S.T. 260 ("Mexico Convention 1972 Amendments"). It is undisputed for present purposes that the cormorant is a non-game bird.

5

The MBTA implements these treaties as federal law.  It was first enacted in 1918 to reflect the mandates of the U.K. Convention, and later amended to reflect each of the subsequently negotiated treaties.  The statute makes it "unlawful at any time, by any means or in any manner," inter alia, to "take" birds listed in the relevant treaties.  16 U.S.C. § 703(a).  To "take" a bird means "to pursue, hunt, shoot, wound, kill, trap, capture, or collect, or attempt to pursue, hunt, shoot, wound, kill, trap, capture, or collect" it.  50 C.F.R. § 10.12.

The MBTA also delegates authority to the United States Secretary of the Interior,

> from time to time, having due regard to the zones of temperature and to the distribution, abundance, economic value, breeding habits, and times and lines of migratory flight of such birds, to determine when, to what extent, if at all, and by what means, it is compatible with the terms of the conventions to allow hunting, taking, capture, killing, possession, sale, purchase, shipment, transportation, carriage, or export of any such bird, or any part, nest, or egg thereof, and to adopt suitable regulations permitting and governing the same, in accordance with such determinations, which regulations shall become effective when approved by the President.

16 U.S.C. § 704.  This authority has been subdelegated by the Secretary to the FWS.  See 50 C.F.R. § 10.1.

When migratory birds converge in large numbers, they may consume large quantities of local plants, fish, or other species.  In doing so, they may harm commercial activity dependent on those species.  For example, as the cormorant population has grown over the past several decades, the FWS has

6

received increasing numbers of complaints from fishermen and operators of aquaculture facilities, such as commercial catfish farms, asserting that cormorants are responsible for plundering the same fish that they seek to gather, cultivate, and sell.

When migratory birds cause, or are about to cause, such acts of "depredation,"[1] the FWS may, upon application, issue a permit that allows a person to take migratory birds for depredation control purposes. See 50 C.F.R. § 21.41. Applications for such permits must include, inter alia, "(1) A description of the area where depredations are occurring; (2) The nature of the crops or other interests being injured; (3) The extent of such injury; and (4) The particular species of migratory birds committing the injury." Id. Permittees are subject to a variety of conditions, including limitations on the manner in which the birds in question may be killed and the proper methods of disposing of their remains. Id.

As an alternative to individual permits, the FWS may, "[u]pon the receipt of evidence clearly showing that migratory game birds have accumulated in such numbers in a particular area as to cause or about to cause serious damage to agricultural, horticultural, and fish cultural interests . . . issue by publication in the Federal Register a depredation order . . . ." 50 C.F.R. § 21.42. Such an order must state explicitly that it is an "emergency measure designed to relieve depredations only"

---

[1] "[A]n act of plundering, despoiling, or making inroads." Webster's Third International Dictionary Unabridged 606 (2002). The FWS regulations do not define the word.

7

and it must impose certain restrictions on the manner in which birds may be killed.  Id.

In addition to these general provisions for addressing depredations, the FWS also provides specific rules for depredation orders that have been issued relating to specific species.  See 50 C.F.R. §§ 21.43-46.  The rules referred to above were all in effect prior to and at the time of the FWS's promulgation of the orders at issue in this appeal.

Agency Proceedings

In response to complaints that cormorants' fish-eating habits were becoming increasingly costly to aquaculture and other industries, the FWS in 1998 adopted an Aquaculture Depredation Order, 50 C.F.R. § 21.47, allowing the taking of cormorants without a permit when they are found committing or about to commit acts of depredation on aquaculture stocks, subject to various conditions and only within thirteen enumerated states.  See id.  This provision was amended when the FWS adopted the Depredation Order at issue in this appeal.

In response to continued complaints of cormorant-related depredations, and an increase in complaints unrelated to aquaculture, the FWS in 1999 issued a Notice of Intent to develop a "national cormorant management plan" with an accompanying Environmental Impact Statement ("EIS") as required by NEPA.  Migratory Bird Permits; Notice of Intent To Prepare an Environmental Impact Statement and National Management Plan for the Double-Crested Cormorant, 64 Fed. Reg. 60,826 (Nov. 8, 1999);

see also 42 U.S.C. § 4332(2)(C). The FWS also formed a "Cormorant Team" consisting of staff members from various FWS offices which consulted with the U.S. Department of Agriculture's Animal and Plant Health Inspection Service ("APHIS"). The team evaluated methods of managing the cormorant population. In December 2001, it released a Draft EIS ("DEIS") for public comment. Notice of Availability; Draft Environmental Impact Statement on Double-Crested Cormorant Management, 66 Fed. Reg. 60,218 (Dec. 3, 2001). The DEIS presented "six management alternatives to address biological and socioeconomic resource conflicts associated with cormorants." Id. They included: 1) no action (continuation of existing cormorant management practices); 2) only non-lethal management techniques; 3) expansion of existing cormorant management policies; 4) a new depredation order; 5) reduction of regional cormorant populations; and 6) frameworks for a cormorant hunting season. Id. From these alternatives, the team recommended the fourth, proposing in the DEIS the adoption of a new depredation order "to allow public resource managers greater flexibility in dealing with cormorant conflicts while ensuring Federal oversight via reporting and monitoring requirements." Id.

The proposed depredation order, as described by the DEIS, "authoriz[es] State, Tribal, and Federal land management agencies to implement a [cormorant] management program, while maintaining Federal oversight of [cormorant] populations via reporting and monitoring requirements." U.S. Fish and Wildlife

9

Service, Draft Environmental Impact Statement: Double-Crested Cormorant Management 17 (2001), available at http://www.fws.gov/migratorybirds/issues/cormorant/deis/chapter2.pdf (last visited July 22, 2008).  These land management agencies would be allowed to take cormorants without a permit "to protect biological resources . . . on public lands and waters," though they were to "utilize non-lethal management tools to the extent they consider[ed] appropriate."  Id. at 18.  The agencies would be required to keep records of all activities and report this data to the FWS annually.  Id. at 19.  The FWS reserved the authority "to immediately suspend or revoke any Agency's authority under [the proposed depredation order]" if the agency did not adhere to the terms specified in the order, if the FWS determined that cormorants no longer posed a threat to public resources, or if the viability of cormorant populations were threatened.  Id.

In March 2003, the FWS published a proposed rule reflecting slight modifications of the proposed depredation order as described in the DEIS.  Migratory Bird Permits; Regulations for Double-Crested Cormorant Management, 68 Fed. Reg. 12,653 (proposed Mar. 17, 2003) (to be codified at 50 C.F.R. pt. 21).  Among other changes, the proposed rule reduced the number of states to which the proposed depredation order would apply from forty-eight to twenty-four, identified with greater specificity the agencies to which the order would apply, restricted its applicability to land and freshwater (therefore excluding

saltwater), and allowed more methods for taking cormorants. Id. at 12,654. It also noted that "[w]hile the [FWS] has the primary responsibility for regulating [cormorant] management, on-the-ground management activities are largely carried out by entities such as State fish and wildlife agencies, wildlife damage control agencies such as the Wildlife Services program of [APHIS] and, in some cases, by private citizens." Id.

The FWS published its final EIS in August 2003 and issued a final rule on October 8, 2003. See Notice of Availability; Final Environmental Impact Statement on Double-Crested Cormorant Management, 68 Fed. Reg. 47,603 (Aug. 11, 2003); Migratory Bird Permits; Regulations for Double-Crested Cormorant Management ("Final Rule"), 68 Fed. Reg. 58,022 (Oct. 8, 2003). The Final Rule established the Depredation Order, 50 C.F.R. § 21.48, and amended the Aquaculture Depredation Order, 50 C.F.R. § 21.47.

Before issuing the order, the FWS reviewed studies related to the growth, breeding, and travel patterns of cormorants in North America. Based on what it considered to be the available science, the agency concluded that:

> (1) [Cormorants] are generalist predators whose diet varies considerably between seasons and locations and tends to reflect fish species composition; (2) The present composition of cormorant diet appears to have been strongly influenced by human-induced changes in the natural balance of fish stocks; (3) "Impact" can occur at different scales, such that ecological effects on fish populations are not necessarily the same as effects on recreational or commercial catches, or vice versa; (4) Cormorant impact

11

is generally most significant in artificial, highly managed situations; and (5) Because environmental and other conditions vary locally, the degree of conflicts with cormorants will vary locally.

Final Rule, 68 Fed. Reg. at 58,025. The FWS noted that in addition to the losses at aquaculture facilities resulting from cormorant depredations, cormorants could also have an adverse impact on other birds and local vegetation. Id.

In its final form, the Depredation Order "authorizes State fish and wildlife agencies, Federally recognized Tribes, and State Directors of the Wildlife Services program . . . to prevent depredations on the public resources of fish . . . , wildlife, plants, and their habitats by taking without a permit double-crested cormorants found committing or about to commit, such depredations." 50 C.F.R. § 21.48(c)(1). The rule requires the initial use of non-lethal control methods, id. § 21.48(d)(1), applies only to cormorants, id. § 21.48(d)(7), and mandates specific measures intended to limit the impact of control efforts on species protected under the Endangered Species Act, id. § 21.48(d)(8). Agencies acting pursuant to the Depredation Order must, for each year in which they intend to act, provide "a one-time written notice" to the FWS indicating their intent to act under the Depredation Order, id. § 21.48(d)(9), and they must notify the FWS in writing thirty days in advance if any "single control action . . . would individually, or a succession of such actions . . . would cumulatively, kill more than 10 percent of the double-crested cormorants in a breeding colony,"

12

id. § 21.48(d)(9)(i). The FWS has the power to prohibit such activity if the FWS deems it "a threat to the long-term sustainability of double-crested cormorants or any other migratory bird species." Id. § 21.48(d)(9)(ii). Agencies are also required to submit annual reports describing their activities under the Depredation Order, including numbers of cormorants killed and nests whose eggs were oiled, id. § 21.48(d)(10)-(11), and the FWS reserves the right to suspend or revoke the authority of any person acting pursuant to the Depredation Order, id. § 21.48(d)(13). In addition to adopting the Depredation Order, the FWS expanded the Aquaculture Depredation Order to allow cormorants to be taken at their winter roost sites. Final Rule, 68 Fed. Reg. at 58,031.

                    District Court Proceedings

In February 2004, the plaintiffs filed a complaint in the United States District Court for the Southern District of New York challenging, inter alia, the FWS's adoption of the Depredation Order, asserting that it was contrary to treaties to which the United States is a party, federal statutes, and FWS regulations. The parties all eventually moved for summary judgment.

In a Memorandum and Order filed March 29, 2005, the district court concluded that the Depredation Order is not in conflict with the MBTA because it balances the factors set forth by the MBTA and determines "'when, to what extent, if at all, and by what means' the taking of [cormorants] is permissible." Fund

13

for Animals v. Norton, 365 F. Supp. 2d 394, 408-11 (S.D.N.Y. 2005) (quoting 16 U.S.C. § 704(a)). To the extent that the MBTA requires a national approach to migratory bird management, the district court reasoned, the requirement is not in conflict with the Depredation Order's limited delegation of discretion to state agencies and regional branches of the FWS because the FWS "has not abdicated its authority, or granted states free reign over management of the cormorant population," particularly in light of the Depredation Order's notice requirements and limits placed on the manner in which cormorants may be taken. Id. at 410-11. The district court also concluded that the Depredation Order does not conflict with the Mexico Convention. Although the Convention requires that each nation establish "close seasons" during which takings are prohibited, the district court deferred to the FWS's view that this provision applies only to the category of game birds, which the parties agree does not include the cormorant. Id. at 412-14.

The district court rejected the plaintiffs' argument that the defendants' adoption of the Depredation Order was arbitrary and capricious, and contrary to the APA, for it found that the record adequately demonstrates that: 1) the double-crested cormorant adversely affects public resources; 2) the Depredation Order is a reasonable method of effectuating the goals of the MBTA; and 3) the Depredation Order does not conflict with the FWS's internal regulations. Id. at 414-23. The court

14

also determined that the defendants had complied with the requirements of NEPA by issuing the final EIS.  Id. at 427-34.

The district court therefore granted the defendants' motion for summary judgment, dismissing all of the plaintiffs' claims.

The plaintiffs appeal the judgment of the district court, but only as to some of the issues it decided.[2]

## DISCUSSION

### I.  Standard of Review

"We review de novo a district court's ruling on cross-motions for summary judgment, in each case construing the evidence in the light most favorable to the non-moving party." White River Amusement Pub, Inc. v. Town of Hartford, 481 F.3d 163, 167 (2d Cir. 2007).  Our review of the Depredation Order under the APA, however, is limited.  We may reverse an agency's informal rulemaking if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A); see also, e.g., Nat'l Black Media Coal. v. FCC, 822 F.2d 277, 280 (2d Cir. 1987).  An agency's factual findings must be supported by "substantial evidence," i.e., "less than a preponderance, but more than a scintilla." Cellular Tel. Co. v. Town of Oyster Bay, 166 F.3d 490, 493-94 (2d Cir. 1999). Substantial evidence "means such relevant evidence as a

---

[2]  The plaintiffs have declined to challenge on appeal the validity of the Aquaculture Depredation Order, 50 C.F.R. § 21.47, or the question of whether the Depredation Order violates the Endangered Species Act, 16 U.S.C. § 1532 et seq.

15

reasonable mind might accept as adequate to support a conclusion." <u>Universal Camera Corp. v. NLRB</u>, 340 U.S. 474, 477 (1951) (internal quotation marks and citation omitted). "The reviewing court must take into account contradictory evidence in the record, but the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." <u>Am. Textile Mfrs. Inst., Inc. v. Donovan</u>, 452 U.S. 490, 523 (1981) (internal quotation marks and citations omitted). When an agency makes a decision in the face of disputed technical facts, "[a] court must be reluctant to reverse results supported by . . . a weight of considered and carefully articulated expert opinion." <u>Fed. Power Comm'n v. Florida Power & Light Co.</u>, 404 U.S. 453, 463 (1972).

In evaluating agency reasoning, we must be satisfied that the agency examined the relevant data and established a "rational connection between the facts found and the choice made." <u>Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.</u>, 463 U.S. 29, 43 (1983) (internal quotation marks and citation omitted).

> The agency's action should only be set aside [if] it 'relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the products of expertise.'

16

Cellular Phone Taskforce v. FCC, 205 F.3d 82, 90 (2d Cir. 2000) (quoting State Farm, 463 U.S. at 43), cert. denied, 531 U.S. 1070 (2001).

II.   Whether the Depredation Order Violates the MBTA

The plaintiffs argue that by delegating "management authority" to the states and other agencies, the Depredation Order violates the MBTA's requirement that any killings of protected birds be specifically authorized by the FWS.  We agree with the district court, however, that the discretion granted to these third parties is limited and subject to adequate oversight by the FWS, and that the Depredation Order therefore does not contravene the MBTA.

Delegation of statutory responsibility by federal agencies and officers to outside parties is problematic because "lines of accountability may blur, undermining an important democratic check on government decision-making," U.S. Telecom Ass'n v. FCC, 359 F.3d 554, 565 (D.C. Cir.), cert. denied, 543 U.S. 925 (2004), and because outside parties, whether private or sovereign, might not "share the agency's national vision and perspective," id. at 566 (internal quotation marks omitted).  We agree with the D.C. Circuit that, absent statutory authorization, such delegation is impermissible.  Id.

The MBTA authorizes the Secretary of the Interior "to determine when, to what extent, if at all, and by what means" takings may occur, 16 U.S.C. § 704(a), and "to adopt suitable regulations permitting and governing the same," id., but the

17

statute does not specifically provide for this authority to be delegated to third parties. Because any unauthorized delegation of this authority beyond the agency would be impermissible, our inquiry focuses on whether the Depredation Order is, in fact, such a delegation.

An agency delegates its authority when it shifts to another party "almost the entire determination of whether a specific statutory requirement . . . has been satisfied," U.S. Telecom, 359 F.3d at 567, or where the agency abdicates its "final reviewing authority," Nat'l Park & Conservation Ass'n v. Stanton, 54 F. Supp. 2d 7, 19 (D.D.C. 1999). Agencies may seek advice and policy recommendations from outside parties, but they may not "'rubber-stamp' decisions made by others under the guise of seeking their 'advice.'" U.S. Telecom, 359 F.3d at 568. If all it reserves for itself is "the extreme remedy of totally terminating the [delegation agreement]," Nat'l Park, 54 F. Supp. 2d at 20, an agency abdicates its "final reviewing authority," id. at 19.

In the case at bar, the authority delegated by Congress to the FWS under the MBTA bears little resemblance to the far narrower band of discretion afforded to those acting under the Depredation Order. The MBTA requires the Secretary "to determine when, to what extent, if at all, and by what means, it is compatible with the terms of the conventions" to permit takings and killings of migratory birds. By contrast, third parties acting pursuant to the Depredation Order are limited to takings

18

of cormorants, and cormorants only, and even then, solely "to prevent depredations on the public resources of fish . . . , wildlife, plants, and their habitats." 50 C.F.R. § 21.48(c). Even if we accept the plaintiffs' warning that the term "depredation" is not explicitly defined by the FWS and could include birds engaging in the natural behavior of eating fish with no evidence of harm to a fish population overall, the Depredation Order nonetheless restricts the species, locations, and means by which takings in response to such depredations could occur, thereby restricting the discretion that may be exercised by third  parties acting under the Order.

The Depredation Order therefore does not represent a delegation of authority but is, instead, a permissible "grant of permission [conditioned] on the decision of another entity, such as a state, local, or tribal government, . . . [with] a reasonable connection between the outside entity's decision and the federal agency's determination." U.S. Telecom, 359 F.3d at 567.  By adopting a rule that provides local agencies discretion to determine what constitutes a "depredation" within a localized context, the FWS was exercising its "broad permitting authority" while incorporating "obviously relevant local concern[s] as . . . element[s] of its decision process." Id.

As a practical matter, of course, by issuing the Depredation Order, the FWS has limited its ability to regulate in advance those takings that are authorized by the Order.  In this regard, the Depredation Order differs from the permit and

19

rulemaking system for handling requests for depredation permits set forth at 50 C.F.R. §§ 21.41-21.42, which prohibits depredation control efforts unless the FWS first affirmatively issues a permit or order, and which requires the FWS to consider beforehand evidence of damage caused or about to be caused by migratory birds. There is, however, no statutory requirement that the FWS provide prior authorization in the form of a permit for specific takings of migratory birds. The MBTA mandates only "suitable regulations permitting and governing" takings. 16 U.S.C. § 704(a). The regulations restricting the taking of migratory birds, even in the absence of an advance permitting scheme, satisfy this statutory requirement.

It is also worth noting that the FWS does retain some authority to regulate takings under the Depredation Order before they occur. For example, the FWS must be notified 30 days in advance of depredation control efforts that would "kill more than 10 percent of the double-crested cormorants in a breeding colony" and may prevent any such efforts with simple notification. 50 C.F.R. § 21.48(d)(9)(i)-(ii). It may also suspend or revoke the authority of third parties to act pursuant to the Depredation Order if they do not adhere to the Order's "purpose, terms, and conditions" or if the "long-term sustainability of double-crested cormorant populations is threatened." Id. § 21.48(d)(13). Finally, the Depredation Order requires third parties acting under it to submit annual reports detailing their activities. The reports are required to include, among other things, an

20

assessment of the effectiveness of control efforts, a description of efforts made to minimize incidental takings, and a tally of the number of cormorants and other migratory birds killed. Id. § 21.48(d)(10). In light of this oversight power and monitoring authority, the FWS is amply equipped to monitor the nationwide status of cormorant populations and to respond to long-term effects on the species.

We conclude that the Depredation Order does not violate the MBTA.

### III. Whether the Depredation Order Conflicts with Treaties to Which the United States Is a Party

Article II(A) of the Mexico Convention -- the only treaty that refers specifically to cormorants -- requires "[t]he establishment of close seasons, which will prohibit in certain periods of the year the taking of migratory birds . . . ." Mexico Convention, art. II, 50 Stat. at 1312. The plaintiffs interpret this provision to apply to all migratory birds -- whether or not they are game birds. In their view, the Depredation Order's failure to provide for a close season renders the order contrary to the treaty and therefore in violation of the MBTA. See 16 U.S.C. § 704 (providing that the MBTA is "[s]ubject to the provisions [of] and [designed] in order to carry out the purposes of the conventions"). We think that the Mexico Convention itself is ambiguous regarding the question of whether the "close seasons" requirement applies to all migratory birds. We therefore defer to the FWS's reasonable view that the

21

Convention requires a close season only for the category of game birds, which the parties agree do not include the cormorant.

"Respect is ordinarily due the reasonable views of the Executive Branch concerning the meaning of an international treaty." El Al Isr. Airlines, Ltd. v. Tsui Yuan Tseng, 525 U.S. 155, 168 (1999); see also Sumitomo Shoji America, Inc. v. Avagliano, 457 U.S. 176, 184-85 (1982) ("Although not conclusive, the meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement is entitled to great weight.").

We will not create ambiguity where none exists, but the text and structure of the Mexico Convention do not express a clear intent regarding the need for a close season for all migratory birds, as opposed to game birds -- a category that does not include cormorants. Article II(A) refers to "the taking of migratory birds," not the taking of "all migratory birds." That section, moreover, creates an exception for "private game farms." And Article II(C) specifies the minimum length of a close season when "their hunting" would be limited, implicitly referring back to the "migratory birds" referenced in subpart (A). These provisions addressing hunting can reasonably be read to suggest that the "migratory birds" at issue in Article II(A) include only those that are hunted, i.e., game birds.

The distinction drawn in Article IV between game birds and non-game birds does little to clarify the meaning of Article II(A) in this regard. The fact that the states parties to the

22

treaty made this distinction makes it clear enough that they were aware of the differences between the two. They therefore could have specified "migratory game birds" at Article II(A) had they meant that the requirement of close seasons applied only to game birds. But it is also possible that they viewed this distinction as implied by the kinds of protection described in Article II, some of which clearly apply only to game birds, and some of which do not.

The plaintiffs suggest that the references to hunting at subpart (C), and to game farms at subpart (A) restrict the meaning of subpart (A)'s "migratory birds" only for those specific purposes. The "close season" requirement remains applicable to all migratory birds. Even if we accept this argument, however, there is nothing in the text or structure of Article II that would foreclose the defendants' contrary interpretation. The plaintiffs' interpretation of Article II(A) is not unreasonable, but the treaty does not unambiguously require such an interpretation. The agency's view -- that Article II(A) refers only to migratory game birds -- is also a reasonable one, and we therefore are required to accept it.[3]

---

[3] The plaintiffs also argue that even if Article II(A) is ambiguous, the defendants' interpretation is not entitled to deference under Chevron U.S.A., Inc. v. Natural Res. Def. Council, 467 U.S. 837, 842-43 (1984), because the agency never expressly adopted this interpretation during the administrative process. Even if the FWS's interpretation had not been adopted prior to this litigation, however, it appears that we would still accord deference to the executive branch view concerning the meaning of the Mexico Convention. See United States v. De La Pava, 268 F.3d 157, 164 n.6 (2d Cir. 2001) (accepting the State Department's view concerning rights under the Vienna Convention,

## IV. Whether the FWS Acted Arbitrarily or Capriciously in Adopting the Depredation Order

The plaintiffs contend that the FWS acted arbitrarily and capriciously in adopting the Depredation Order. In their view, the Order "authoriz[ed] a full-scale assault on the protected birds" in the absence of evidence that cormorants were having a widespread impact. Appellants' Br. at 46. We disagree.

Although the Depredation Order applies to about half the states, depredation control efforts pursuant to the Depredation Order may take place only when cormorants are found "committing or about to commit" depredations and under specified conditions. See 50 C.F.R. § 21.48(c)(1). By so limiting control efforts, the Depredation Order provides a "rational connection between the facts found and the choice made" and is therefore neither arbitrary nor capricious. See State Farm, 463 U.S. at 43 (internal quotation marks omitted).

As the plaintiffs observe, the FWS does not provide evidence that cormorants have a "widespread impact" on public resources. Appellants' Br. at 46. But it is the FWS's position that the agency was not required to make any such finding to support the Depredation Order. In its review of studies addressing the impact of cormorants on various types of public resources, the FWS noted that "negative impacts are typically very site-specific and thus [cormorant]-fish conflicts are most likely to occur on a localized scale," Final Rule, 68 Fed. Reg.

provided in response to questions posed by the Court of Appeals for the First Circuit).

24

at 58,025; that "[w]hile large-scale impacts on regional or continental bird populations have not been documented" there was evidence that other bird species could "be negatively impacted by [cormorants] at a site-specific level," id.; and that cormorants caused significant financial loss at aquaculture facilities and fish hatcheries, which are localized by their nature, id. at 58,026. Studies reviewed by the FWS also concluded that cormorant predation had adverse impacts in states including Wyoming, New York, and states in the Upper Midwest, South, and Mississippi Delta region, whether in the form of cormorant diets skewed heavily towards fish, or economic losses due to cormorant predation at aquaculture or hatchery facilities. As the FWS itself acknowledged, these studies did not provide a full picture of the interaction between cormorants and local resources. The FWS recognized the "need for more information about [cormorants] and their impacts on resources across a variety of ecological settings" and agreed with critics of the Depredation Order that "better information on population status and trends is desirable." Id. at 58,023. What the FWS did establish, though, was that in a large number of states, cormorants were responsible for localized, site-specific harm to public resources, even if not on a state-wide basis.

The remaining question, then, is whether the Depredation Order is a reasonable response to this evidence of harm. In light of the limited discretion afforded by the Depredation Order, we conclude that it is. The express intent of

25

the Order is "to enhance the ability of resource agencies to deal with immediate, localized [cormorant] damages." Id. And that is precisely what the Depredation Order does. It applies only to the public resources of affected states, 50 C.F.R. § 21.48(b), (c)(1), and takings are permitted only of those cormorants "committing or about to commit . . . depredations," id. § 21.48(c)(1). All takings must be recorded and detailed in annual reports. The FWS must be notified in advance of activity that would result in the taking of more than 10 percent of a breeding colony. The FWS may also prevent such activity it deems to be a threat to the long-term sustainability of cormorants. These restrictions adequately limit depredation control activities under the Depredation Order to address the types of harm the FWS specifically found are caused by cormorants. Although, as discussed, there may be some uncertainty in the meaning of "depredation," the discretion provided by the Depredation Order to local agencies to determine when depredations occur is not so expansive that it would render the order arbitrary and capricious.

The plaintiffs also argue that instead of the Depredation Order, the FWS should have adopted a "less drastic liberalized permitting scheme" similar to some of the alternatives considered by the FWS. Appellants' Br. at 49. Perhaps such an approach would be a better response than the Depredation Order in providing local agencies with some degree of flexibility, addressing actual cormorant damage, and avoiding

26

unnecessary takings of cormorants. However, the FWS has articulated adequate explanations for its choice not to adopt this, or another, alternative approach, preferring to grant local agencies a degree of flexibility that the FWS thinks will more "adequately address resource damages caused by [cormorants]" than permit-based approaches. Final Rule, 68 Fed. Reg. at 58,034. It is, of course, typically the case that there are several different possible responses to a given problem, more than one of which may be rational. In this case, the Depredation Order represents one rational response to the problem of cormorant depredation based on evidence available to the FWS, and the FWS has explained its reasons for choosing one rational response over others. This is the limit of our inquiry, see Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971), and we therefore conclude that the FWS complied with the APA in adopting the Depredation Order.

V. Whether the FWS Complied with NEPA in Adopting the Depredation Order

In order to adopt the Depredation Order, the FWS was required by NEPA to prepare an EIS that would "provide full and fair discussion of significant environmental impacts and . . . inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1; see 42 U.S.C. § 4332(2)(C). "NEPA is a procedural statute that mandates a process rather than a particular result. . . . [It] does not command an agency to favor any

27

particular course of action, but rather requires the agency to withhold its decision to proceed with an action until it has taken a 'hard look' at the environmental consequences." Stewart Park & Reserve Coal., Inc. (SPARC) v. Slater, 352 F.3d 545, 557 (2d Cir. 2003) (internal citation omitted). The court's role is to ensure that NEPA's procedural requirements have been satisfied, not to "interject itself within the area of discretion of the executive as to the choice of the action to be taken." Kleppe v. Sierra Club, 427 U.S. 390, 410 n.21 (1976) (internal quotation marks and citation omitted).

Where there is uncertainty regarding the potential effects of an agency action, "speculation in an EIS is not precluded, [but] the agency is not obliged to engage in endless hypothesizing as to remote possibilities." County of Suffolk v. Sec'y of Interior, 562 F.2d 1368, 1379 (2d Cir. 1977). Even where this uncertainty arises from disparate state and local regulation that may affect federal action, we have not required detailed information regarding the effects of these regulations in an EIS where such "information would be of little or no utility in determining the impact of state and local exercise of regulatory powers, since each of the states and municipalities affected could change its regulations . . . between the publication of the EIS" and the time when such local regulations would affect the federal action. Id.

The plaintiffs point to the lack of site-specific or localized analysis in the EIS as evidence that the FWS violated

28

NEPA's requirement to examine and permit the public to comment on the environmental impact of the proposed Depredation Order. But under the order, the FWS did not commit itself to any site-specific actions, and it would have been largely speculative for the FWS to identify the specific, localized areas where control efforts under the order would take place. We therefore do not think that the FWS was obligated under NEPA to include site-specific analyses in the EIS.

Under the Depredation Order, local agencies have discretion to select the particular sites at which to pursue depredation control efforts, subject of course to the constraints set forth in the Depredation Order. The Depredation Order does not itself mandate that local agencies utilize their authority under the Order. And, because cormorant depredation is highly localized, and because the Depredation Order limits control efforts only to those cormorants "found committing or about to commit" depredation, the exact locations where local agencies might act pursuant to the Depredation Order could not be known with any certainty by the FWS in advance. These compounded uncertainties would render any site-specific EIS virtually impossible to prepare. Not only would it be uncertain where control efforts under the Depredation Order could take place, it would remain uncertain whether any control efforts actually would take place there. The FWS had no means of reliably identifying the relevant sites, let alone ascertaining whether any actions under the Depredation Order would be warranted at that site.

29

Effects that are not reasonably foreseeable need not be included in an EIS. See 40 C.F.R. § 1508.8 (including as effects for EIS purposes those "which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable"); Suffolk County, 562 F.2d at 1378 ("If the additional information would at best amount to speculation as to [a] future event or events, it obviously would not be of much use as input in deciding whether to proceed."). The FWS therefore did not violate NEPA by omitting site-specific analyses in this case.

In the absence of any certain site-specific action, then, it was sufficient for the FWS here to prepare only a programmatic EIS. See 40 C.F.R. § 1502.4(c) (Environmental impact statements on "broad actions" may be prepared "[g]enerically, including actions which have relevant similarities, such as common timing, impacts, alternatives, methods of implementation, media, or subject matter."); see also Friends of Yosemite Valley v. Norton, 348 F.3d 789, 801 (9th Cir. 2003) ("NEPA requires a full evaluation of site-specific impacts only when a 'critical decision' has been made to act on site development -- i.e., when the agency proposes to make an irreversible and irretrievable commitment of the availability of resources to [a] project at a particular site. The determination of whether a 'critical decision' has been made begins with an accurate description of the [agency's] proposed action." (emphases, internal quotation marks, and citations omitted)). Any site-specific actions to which the FWS or any other agency subsequently committed would require the

30

preparation of a site-specific EIS – even if the action were undertaken pursuant to the Depredation Order -- if the programmatic EIS is insufficient to address the environmental impact of the site-specific action.  See Nat'l Audubon Society v. Hoffman, 132 F.3d 7, 13 (2d Cir. 1997) (citing Manatee County v. Gorsuch, 554 F. Supp. 778 (M.D. Fla. 1982)).  But because the Depredation Order itself does not commit FWS to any site-specific control efforts, its adoption did not require any corresponding site-specific EIS.

The FWS did not violate NEPA in adopting the Depredation Order.

**CONCLUSION**

We have considered the plaintiffs' remaining arguments and find them to be without merit.  For the foregoing reasons, the judgment of the district court is affirmed.