**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| FRIENDS OF ANIMALS; PREDATOR DEFENSE, *Plaintiffs-Appellants*, v. UNITED STATES FISH AND WILDLIFE SERVICE, an agency of the United States, *Defendant-Appellee.* | No. 15-35639 D.C. No. 6:14-cv-01449-AA OPINION |

Appeal from the United States District Court
for the District of Oregon
Ann L. Aiken, District Judge, Presiding

Argued and Submitted October 5, 2017
Portland, Oregon

Filed January 10, 2018

Before: Diarmuid F. O'Scannlain, Richard A. Paez,
and Carlos T. Bea, Circuit Judges.

Opinion by Judge O'Scannlain

**SUMMARY**[*]

**Migratory Bird Treaty Act**

The panel affirmed the district court's summary judgment in favor of the U.S. Fish and Wildlife Service in an action brought by plaintiff animal advocacy groups challenging the Service's permit allowing the taking of the barred owl.

Plaintiffs alleged that the permit was unlawful because under the Migratory Bird Treaty Act ("MBTA"), when the Service permits a take for scientific purposes, the action must be intended to advance the conservation or scientific understanding of the same species.

The panel held that the MBTA imposed few substantive conditions itself, and delegated to the Secretary of the Interior broad discretion to implement the MBTA. The panel rejected plaintiffs' contention that the MBTA's underlying Conventions codified the same-species theory, which was then binding on the Service through the MBTA's "consistency" provision. Specifically, the panel held that the "used for scientific purposes" exception in Article II(A) of the Mexico Convention included taking birds to study whether their absence benefits another protected bird species. The panel also held that the canon of *noscitur a sociis* did not compel a reading of the Mexico Convention to imply a same-species limitation. The panel further held that Canada, Japan, and Russia Conventions, if they even applied

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

to this case, did not require a same-species limitation when taking migratory birds for scientific purposes.

The panel held that because the plain text of the MBTA and the Conventions did not compel a same-species limitation, the panel need not consider the question of deference to the agency's interpretation.

**COUNSEL**

Michael Ray Harris (argued) and Jennifer E. Best, Friends of Animals, Centennial, Colorado, for Plaintiffs-Appellants.

Rachel E. Heron (argued), David Shilton, and Andrew Mergen, Attorneys, Appellate Section; Coby Howell, Attorney, Wildlife & Marine Resources Section; John C. Cruden, Assistant Attorney General; Environment and Natural Resources Division, United States Department of Justice, Washington, D.C.; Diane Hoobler, Senior Attorney, Pacific Northwest, Regional Solicitor's Office; Philip Kline, Attorney-Advisor, Office of the Solicitor, United States Department of the Interior, Portland, Oregon; for Defendant-Appellee.

**OPINION**

O'SCANNLAIN, Circuit Judge:

We must decide whether the Migratory Bird Treaty Act allows the United States government to issue a permit to remove birds of one species for scientific purposes if its intent is principally to benefit another species.

I

A

This case arises from efforts by the United States Fish and Wildlife Service ("Service") to balance the interests of two types of owls who compete for the same territory. The first is the northern spotted owl, whose range is from British Columbia to California but the majority of which are "found in the Cascades of Oregon and the Klamath Mountains in southwestern Oregon and northwestern California." *See* Endangered and Threatened Wildlife and Plants; Determination of Threatened Status for the Northern Spotted Owl, 55 Fed. Reg. 26,114, 26,115 (June 26, 1990). In 1990, the Service determined the northern spotted owl to be a threatened species pursuant to the Endangered Species Act of 1973, 16 U.S.C. §§ 1531 *et seq. See* 55 Fed. Reg. at 26,114. The principal reason for the decline in the population was the loss of old-growth forest habitats on which the species relies. *Id.*

A second factor in the northern spotted owl's population decline, however, involved another species of owl at issue in this case: the barred owl. The barred owl's "adaptability and aggressive nature appear to allow it to take advantage of habitat perturbations," and it has spread from its native habitat in the eastern United States to the Northwest, where

it has come greatly to outnumber the native northern spotted owls. *Id.* at 26,191. Barred owls' diets can overlap with spotted owls' by as much as 76%, and the more aggressive barred owl may displace spotted owls and may even physically attack them.

This litigation arises from the Service's 2008 recovery plan for the northern spotted owl. Although that plan includes a significant focus on habitat preservation, the Service also concluded that "the barred owl constitutes a significantly greater threat to spotted owl recovery than was envisioned when the spotted owl was listed in 1990," and, "[a]s a result, the Service recommend[ed] specific actions to address the barred owl threat." One of those actions was to "[d]esign and implement large-scale control experiments in key spotted owl areas to assess the effects of barred owl removal on spotted owl site occupancy, reproduction, and survival," experiments that the Service hoped would "substantially expand our knowledge of the ecological interactions between spotted owls and barred owls" and "identify important cause-and-effect relationships between barred owls and the population declines of spotted owls, as well as the densities at which negative effects from barred owls occur." An updated recovery plan issued in 2011 retained this experimental action item.

To carry out the proposed study, the Service went through a notice-and-comment process to prepare an Environmental Impact Statement for the experiment. *See* Experimental Removal of Barred Owls To Benefit Threatened Northern Spotted Owls; Final Environmental Impact Statement, 78 Fed. Reg. 44,588 (July 24, 2013). The Service adopted an experimental design that would involve taking about 3,600 barred owls over four years, affecting

about 0.05% of the barred owls' range.[1]  The Service predicted that "[b]arred owl populations are anticipated to return to starting levels within 3 to 5 years of the end of . . . removal."  To allow the experiment to proceed, the Service stated that it would "issue a scientific collecting permit" (the "permit"), pursuant to 50 C.F.R. § 21.23, "for the lethal and non-lethal take as required under the Migratory Bird Treaty Act."  The Service, through its Migratory Bird Permit Office, issued the permit to a branch of itself, the Oregon Fish and Wildlife Office.  In 2014, due to delays caused by funding issues, that office requested a modified permit reducing the total take from 3,600 to 1,600 barred owls.  The modification was granted, and a memorandum accompanying the new permit stated that "[t]he take of Barred Owls requested in this application is for bona fide scientific research" that "advances the scientific understanding of both species" of owls.

B

Friends of Animals and Predator Defense (collectively, "Friends") are not-for-profit animal advocacy organizations that objected to the experiment that would see the Service kill birds of one species to conserve another, and they filed suit in the Eastern District of California to challenge the permit allowing the taking of the barred owls.  That case was dismissed for lack of standing because the only member of Friends who alleged personal injury caused by the Service's actions planned to visit only areas where the Service did not

---

[1] "To 'take,' when applied to wild animals, means to reduce those animals, by killing or capturing, to human control."  *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 717 (1995).  As the Service acknowledges, the "vast majority of take" at issue in this case consists of "intentional, lethal take of barred owls."

plan to take barred owls and so could not show that he had "any concrete plans to visit an area that will be affected by the conduct that impairs his interests." *Friends of Animals v. Jewell*, No. 13-CV-02034, 2014 WL 3837233, at \*5–8 (E.D. Cal. Aug. 1, 2014).

Friends then filed this suit in September 2014, alleging that the permit violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, and the Migratory Bird Treaty Act ("MBTA" or the "Act"), 16 U.S.C. § 703 *et seq.* In support of the latter claim, Friends argued that, under the MBTA, "when the [Service] permits take for scientific purposes, the action must be intended to advance the conservation of the very species being taken." The district court disagreed and granted the Service's motion for summary judgment on both the NEPA and MBTA claims. In explaining that ruling, the court concluded that "nothing" in the MBTA or the international conventions it implements limits scientific purposes to the species taken.

Friends timely appealed.**[2]**   Here, they press only the MBTA claim.**[3]**

## II

Friends' core argument before us is that the permit was unlawful because, they say, under the MBTA, when the Service "permits take for scientific purposes, the action must be intended to advance the conservation or scientific understanding of the very species being taken."  For concise reference, we will refer to this as the "same-species theory," and Friends' appeal rises or falls on whether such theory is, in fact, compelled by the MBTA and the underlying international conventions on migratory birds that it implements.

---

**[2]** We have jurisdiction under 28 U.S.C. § 1291 to review the final decision of the district court.  The government does not contest standing, but we have "an independent duty" under Article III "to assure that standing exists."  *Washington Envtl. Council v. Bellon*, 732 F.3d 1131, 1139 (9th Cir. 2013).  We are satisfied that Friends have demonstrated the injury-in-fact element of standing through declarations of two members who meet the standard for environmental cases in showing that they have an "aesthetic or recreational interest in a particular place[] or animal . . . that . . . is impaired by [the Service's] conduct."  *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1119 (9th Cir. 2005) (internal quotation marks omitted).

**[3]** "We review de novo the district court's grant of summary judgment."  *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 858 (9th Cir. 2005).  Where, as here, the agency's action is governed by the Administrative Procedure Act, we only set aside its "actions, findings, or conclusions if they are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"  *Id.* (quoting 5 U.S.C. § 706(2)(A)).

A

"As always, we begin with the text of the statute." *Limtiaco v. Camacho*, 549 U.S. 483, 488 (2007). The MBTA makes it unlawful to take any migratory bird covered by the Act "except as permitted by regulations made as" provided in the Act. 16 U.S.C. § 703(a). "[T]he Secretary of the Interior is authorized and directed . . . to determine when . . . it is compatible with the terms of the conventions to allow . . . taking . . . and to adopt suitable regulations permitting and governing the same." *Id.* § 704(a). Those regulations are "[s]ubject to the provisions and in order to carry out the purposes of the conventions." *Id.*

The Secretary of the Interior has exercised the authority delegated by the MBTA to promulgate regulations governing the taking of migratory birds. Most relevant to this case is 50 C.F.R. § 21.23, which governs scientific collecting permits and under which the Service issued the permit. Under such regulation, applications to take migratory birds for scientific or educational purposes must describe the species and number of birds to be taken, the location of collection, the purpose of the research project, and the institution to which specimens will ultimately be donated. 50 C.F.R. § 21.23(b). In addition to being subject to the general conditions applicable to all permits for taking migratory birds, scientific permits require that "[a]ll specimens taken . . . be donated and transferred to the public[,] scientific, or educational institution designated in the permit application." *Id.* § 21.23(c)(1).

The MBTA thus imposes few substantive conditions itself and delegates to the Secretary of the Interior broad discretion to implement the Act, discretion the Secretary has used to promulgate the regulation at issue that has no text directly supporting Friends' proposed same-species theory.

Friends do not suggest that we will find specific language in the Act itself or the implementing regulations that compel its theory.[4]

## B

Instead, Friends argue that the underlying conventions codify the same-species theory, which is then binding on the Service through the MBTA's "consistency" provision, which stipulates that regulations under the Act must be "[s]ubject to the provisions and in order to carry out the purposes of the conventions." 16 U.S.C. § 704(a). There are four conventions referenced in the Act for the protection of migratory birds, one each with Canada, Mexico, Japan, and Russia (the "Conventions").[5] Of the four, owls are protected only under the Mexico Convention.

---

[4] Friends do hint obliquely that the permitting decision was inconsistent with the regulation on special purpose permits—permits for purposes "outside the scope of the standard form permits"—that requires applicants to make "a sufficient showing of *benefit to the migratory bird resource*, important research reasons, reasons of human concern for individual birds, or other compelling justification." 50 C.F.R. § 21.27 (emphasis added). But Friends provide no argument for why the special purpose regulation is relevant when the permit was issued under the separate scientific collecting regulation. Even if the special purpose regulation were relevant, its language is disjunctive so that a permit could be issued either to "benefit . . . the migratory bird resource, important research reasons, . . . *or* other compelling justifications." 50 C.F.R. § 21.27 (emphasis added). It therefore fails to support the same-species theory.

[5] *See* Convention between the United States of America and the United Kingdom of Great Britain and Ireland for the Protection of Migratory Birds in the United States and Canada, U.S.-U.K., Aug. 16, 1916, 39 Stat. 1702, as amended by the Protocol of Dec. 5, 1995, S. Treaty Doc. No. 104-28; Convention between the United States of

Friends' principal argument in favor of the same-species theory is based on Article II of the Mexico Convention, which provides that Mexico and the United States "agree to establish laws, regulations and provisions" for, among other things, "[t]he establishment of close seasons, which will prohibit in certain periods of the year the taking of migratory birds." Mexico Convention, art. II. That provision provides an exception to the close seasons for taking birds "when used for scientific purposes, for propagation or for museums." *Id.*, art. II(A). Friends contend that the language of the exception requires that any taking for scientific purposes must comport with the same-species theory.

1

Friends' leading argument supporting that interpretation is that the phrase "when *used* for scientific purposes" implies a limitation comporting with the same-species theory. As they put it, such language suggests a requirement "that a taken migratory bird *be used* directly for a scientific purpose, propagation or for museums." They say that the experiment at issue fails to satisfy that requirement because "the main *purpose* of [it] is to 'eliminate,' not conserve, a protected bird," and "very few, if any, of the . . . barred owls killed will

America and the United Mexican States for the Protection of Migratory Birds and Game Mammals, U.S.-Mex., Feb. 7, 1936, 50 Stat. 1311; Convention between the Government of the United States of America and the Government of Japan for the Protection of Migratory Birds and Birds in Danger of Extinction, and Their Environment, U.S.-Japan, Mar. 4, 1972, 25 U.S.T. 3329; Convention between the United States of America and the Union of Soviet Socialist Republics Concerning the Conservation of Migratory Birds and their Environment, U.S.-U.S.S.R., Nov. 19, 1976, 29 U.S.T. 4647. We refer to these, respectively, as the "Canada Convention," "Mexico Convention," "Japan Convention," and "Russia Convention."

be, themselves, used for a scientific purpose, propagation or for museum[s].”

The Service responds that “all barred owls taken under the permit will be used for scientific purposes” because “[r]emoval to study effects on the surrounding environments is use for a scientific purpose.” Moreover, the Service says, the permit even satisfies Friends’ narrow definition of “use” because the permit requires that “[a]ny specimens . . . possessed after the expiration of [the] permit must be transferred to [the Service] . . . or donated and transferred to California Academy of Sciences Dept. of Ornithology and Mammalogy.” Therefore, says the Service, “all barred owls taken and retrieved” will “be donated to public educational and research institutions, where their remains may be the subject of additional scientific research.”

If the word “used” in the Convention does not support Friends’ position, we need not resolve whether the incidental donation of some of the taken barred owls to scientific institutions would satisfy Friends’ proposed limitation. So, we turn first to that threshold question of whether “used” implies a same-species limitation at all.

a

We begin by noting that the proposed theory Friends derive from the phrase “used for scientific purposes” is distinct from their proposed same-species limitation whereby scientific-collection permits “must be intended to advance the conservation or scientific understanding of the very species being taken.” A taken specimen could itself be used directly for a scientific purpose that does not benefit its species’ conservation or understanding. As the Service points out, in the past it has issued permits to take barn owls for research on human hearing and hummingbirds for

research on flight aerodynamics. In those examples, the taken birds would themselves be used for scientific purposes. The experiments would therefore satisfy the specimen-specific theory Friends suggest based on the language in Article II(A) of the Mexico Convention. But the experiments would not satisfy a version of the same-species theory requiring that the taking also benefit the species' conservation, because they have nothing to do with conservation. So, the principal textual argument Friends make already fails to support the limitation they initially proposed. Because the specimen-specific restriction derived from Article II(A) could also invalidate the Service's actions, though, we consider it on its own terms.

b

"When a word is not defined by statute, we normally construe it in accord with its ordinary or natural meaning." *Smith v. United States*, 508 U.S. 223, 228 (1993). Applying that principle, the Supreme Court has looked to dictionaries in other contexts to determine what the word "use" means:

> Webster's defines "to use" as "[t]o convert to one's service" or "to employ." Black's Law Dictionary contains a similar definition: "[t]o make use of; to convert to one's service; to employ; to avail oneself of; to utilize; to carry out a purpose or action by means of." Indeed, over 100 years ago we gave the word "use" the same gloss, indicating that it means "to employ" or "to derive service from."

*Id*. at 228–29 (alterations in original) (internal quotation marks and citations omitted). Applying those definitions, the Mexico Convention therefore allows the taking of owls during close seasons when those owls are employed for a

scientific purpose or when a scientific purpose is carried out by means of those owls.

There is some common-sense appeal to Friends' interpretation. It would be odd to say colloquially that a bird was "employed for a scientific purpose" when the purpose of taking the bird was to procure its demise and not affirmatively to experiment with the bird or its cadaver. If the Convention drafters wanted clearly to adopt the Service's interpretation, language such as "*taken* for a scientific purpose" would have been a better fit. That being said, if we apply the broader dictionary definitions of "use," then to "use for scientific purposes" could mean "to employ" the bird, or "to carry out" a scientific purpose "by means of" the bird, or "to derive service" from the bird for a scientific purpose. Removing a bird to procure its demise likely fits within the letter of those definitions, even if the bird (or its cadaver) is not itself the subject of scientific experiment. The question is close enough, though, that if we had to interpret the meaning of Article II(A) in isolation, the meaning of "used" might be ambiguous.

c

The surrounding text and structure of the Convention, however, decisively favor the Service's broader interpretation of the word "used." Interpretation of legal text "is a holistic endeavor," and a "provision that may seem ambiguous in isolation is often clarified by the remainder of the . . . scheme," here "because only one of the permissible meanings produces a substantive effect that is compatible" with the remainder of the treaty. *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988).

The text of Article II begins with: "The high contracting parties agree to establish laws, regulations and provisions *to satisfy the need set forth in the preceding Article*." Mexico Convention, art. II (emphasis added). That "preceding Article" is Article I, which sets out the purposes of the Mexico Convention and envisions a broad use of protected birds. Specifically, it provides:

> In order that the species may not be exterminated, the high contracting parties declare that it is right and proper to protect birds denominated as migratory . . . by means of adequate methods which will permit, in so far as the respective high contracting parties may see fit, the utilization of said birds rationally for purposes of sport, food, commerce and industry.

*Id.*, art. I.

The structure of the Convention is thus to define its scope and aims in Article I and to articulate certain measures the parties must implement to achieve those aims in Article II. Its paramount goal is that migratory bird species "may not be exterminated." *Id.* It gives broad latitude to the parties to permit use of birds as they "may see fit," and it envisions the "utilization of the birds" for a broad range of purposes—sport, food, commerce, and industry—which generally serve no benefit to the birds themselves. *Id.* The specifically sanctioned uses for the broad and undefined fields of "commerce and industry" also suggest that the Convention envisions that birds might sometimes be taken for purposes not related to using the taken specimens themselves.

Where a provision indicates it is intended to satisfy the need of preventing the extermination of protected species, it

makes little sense to interpret a vague word in such provision to block a party from engaging in a bona fide scientific experiment to accomplish that very purpose. Under Friends' interpretation, the Service could seemingly take barred owls to display them in museums but could not take them to prevent the extermination of spotted owls, even though the effect on the barred owl population would be minimal. That bizarre result runs entirely contrary to the principles articulated in Article I, which the Convention expressly says are to be implemented by the provisions in Article II.

At oral argument, Friends objected to reading Article II's provisions in light of Article I on the ground that the two Articles have distinct roles: Article I explains what uses are generally permitted whereas Article II sets out specific uses that are not. We are cognizant of the "commonplace" rule of statutory construction "that the specific governs the general," and we would not eviscerate a clear, specific prohibition based on general purposive language. *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (internal quotation marks omitted). But that is not the situation before us. Instead, we must interpret vague language in Article II, which itself expressly tells us that its terms are intended to implement Article I's goals. In such case, the proper way to read indefinite terms in Article II is congruent with the broad purposes of Article I.

We therefore conclude that the "used for scientific purposes" exception in Article II(A) of the Mexico Convention includes taking birds to study whether their absence benefits another protected bird species. We need not decide just how far the exception extends because, read in the full context of Articles I and II, it clearly encompasses a controlled scientific study to save a threatened species

covered by the Convention when that study will have only a negligible effect on the overall population of the taken species.[6]

2

At oral argument, Friends suggested a secondary basis to support their reading of the Mexico Convention to imply a same-species limitation: that the canon of *noscitur a sociis* compels such reading. There, "words grouped in a list should be given related meaning." *Third Nat'l Bank in Nashville v. Impac Ltd.*, 432 U.S. 312, 322 (1977). More generally, when words "are associated in a context suggesting that the words have something in common, they should be assigned a permissible meaning that makes them similar." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 195 (2012). Based on such principle of textual interpretation, Friends suggest that in Article II(A)'s exception for taking birds when "used for scientific purposes, for propagation or for museums," the phrase "for scientific purposes" should be read to be limited by the other elements in that series, namely "for propagation" and "for museums." Friends argue that if one is taking a bird for propagation or for museums, the bird itself is being used for the propagative or museum purpose,

---

[6] The Service also obliquely argues that the close-season provision does not even apply to non-game birds like owls. At least one of our sister circuits has adopted that view. *See Fund for Animals v. Kempthorne*, 538 F.3d 124, 134 (2d Cir. 2008) ("We . . . defer to the [Service's] reasonable view that the [Mexico] Convention requires a close season only for the category of game birds."). Because we conclude that the scientific collection permit at issue is consistent with the Mexico Convention's close-season provision, we need not determine whether such provision applies to non-game birds like owls.

so "scientific purposes" should be restricted in the same manner.[7]

We find such implied limitation unpersuasive. As a threshold matter, it is not clear that the *noscitur* canon even applies to this list. "For the associated-words canon to apply, the terms must be conjoined in such a way as to indicate that they have some quality in common." Scalia & Garner, *supra*, at 196. The terms "scientific purposes," "propagation," and "museums" are sufficiently distinct that there is no obvious common denominator among them. It is just as plausible that each was intended to be read distinctly as a separate exception as that they were intended to be read in concert as sharing certain elements.

Even if the *noscitur* canon did apply, however, we do not believe it supports Friends' same-species theory. Perhaps the most natural reading of taking a bird "for museums" is to display or study that particular specimen itself, but "propagation" need not share that limitation. Of course, one way to use a bird for propagation is to take that bird and breed it, but it is just as plausible to promote propagation by taking a bird to clear the way for others to propagate. In fact, that is exactly what the Service is aiming to do in its study: take barred owls in order to assist the propagation of northern spotted owls. Especially when read against the backdrop of Article I's articulated aims to assure that protected "species may not be exterminated" and to promote a broad set of uses, we see little justification for reading

---

[7] We note that this argument again supports only the specimen-specific version of the same-species theory, rather than Friends' original proposed same-species limitation that a taking must support the species' conservation.

"propagation" as narrowly as do Friends and then further to extend that narrow reading to limit "scientific purposes."

3

Friends' final argument in favor of their same-species theory based on the Mexico Convention is that the Service's loose definition of scientific purposes invites a slippery slope.  Friends argue that under the Service's interpretation, "the law authorizes the killing of any migratory bird so long as the killing is for *a* scientific purpose, no matter how unrelated to the conservation of the species being killed. . . . Carried to its extreme, this position would allow for an entire migratory bird species . . . to be exterminated so long as there is a scientific basis to do so, whether it is related to another animal, or even for human economic gain."

The Service disputes that any such slippery slope exists. In this specific case, it points out that it "found that the experiment . . . was a bona fide scientific study," that it will "minimiz[e] the number of barred owls to be removed," and that the study will "have a negligible impact on the barred owl" population.  In more extreme cases such as the hypothetical raised by Friends, the Service contends that "scrutinizing the proposed take's effect on the taken species before issuing a scientific-collecting permit is a far more direct way of protecting migratory-bird populations than limiting what study area a permit may advance."

We are persuaded by the Service's suggested backstop against Friends' parade of horribles.  Reading Articles I and II of the Mexico Convention in concert, they require that the parties "establish laws, regulations and provisions" to assure that covered "species may not be exterminated."  In the event that the Service were to propose an experiment to exterminate a species protected by the Mexico Convention,

Friends could point to clear text in the Convention to challenge that experiment, in addition to relying on other restrictions imposed by federal laws such as NEPA and the Administrative Procedure Act, 5 U.S.C. § 500 *et seq.* The Convention's conservation purposes may thus be achieved without reading into it a same-species limitation that is unsupported by its text.

## C

Friends also point to the Canada, Japan, and Russia Conventions to argue that they support the same-species theory. Friends provide no argument for why those Conventions—which cover neither barred nor spotted owls—are applicable. *Cf. Fund for Animals v. Norton*, 365 F. Supp. 2d 394, 411 (S.D.N.Y. 2005), ("[A]gency action should be evaluated for compliance only as to conventions that explicitly govern the disputed bird species, not for compliance with all four conventions."), *aff'd sub nom. Fund for Animals v. Kempthorne*, 538 F.3d 124 (2d Cir. 2008). In any event, even if those Conventions did apply in this case, we see nothing in them requiring a same-species limitation when taking migratory birds for scientific purposes.

The Canada Convention provides that "the taking of migratory birds may be allowed at any time of the year for scientific, educational, propagative, or other specific purposes consistent with the conservation principles of this Convention." Canada Convention, art. II, ¶ 3. Those conservation principles are defined as the following: "[t]o manage migratory birds internationally," "[t]o ensure a variety of sustainable uses," "[t]o sustain healthy migratory bird populations for harvesting needs," "[t]o provide for and protect habitat necessary for the conservation of migratory birds," and "[t]o restore depleted populations of migratory

birds." *Id.*, art. II. The Japan and Russia Conventions each have similar language, although the principles in those Conventions are not expressly defined. *See* Japan Convention, art. III, ¶ 1; Russia Convention, art. II, ¶ 1.

No language in the defined purposes of the Canada Convention—or in the preambulatory text describing the objectives of the Japan and Russia Conventions—prevents taking a non-threatened protected species for a scientific experiment to protect a different threatened protected species. To the contrary, the defined purpose to "restore depleted populations of migratory birds" supports the Service's objectives in issuing the challenged permit. Those Conventions, then, do not salvage Friends' argument in favor of a same-species limitation.

## III

The Service contends that if there were ambiguity in the MBTA or underlying Conventions, we would be required to defer to its interpretation under one of several doctrines. Because the plain text of the MBTA and the Conventions do not compel a same-species limitation, however, we need not consider the question of deference to the agency's interpretation.[8] *Cf. Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 n.9 (1984) ("The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent. . . . If a court, employing traditional tools of statutory construction, ascertains that

---

[8] We do not opine that the Department of the Interior is foreclosed from imposing on itself a same-species limitation under the broad discretion given it by the MBTA and the underlying Conventions; only that nothing in those texts requires that it do so.

Congress had an intention on the precise question at issue, that intention is the law and must be given effect."); *County of Amador v. United States Dep't of the Interior*, 872 F.3d 1012, 1025 (9th Cir. 2017) ("We need not decide whether *Chevron* deference is owed to the agency because . . . we reach the same conclusion as the agency even without it."); Scalia & Garner, *supra*, at 31 ("A fundamental rule of textual interpretation is that neither a word nor a sentence may be given a meaning that it cannot bear.").

## IV

For the foregoing reasons, the judgment of the district court is **AFFIRMED**.