19-2886-ag(L)
XY Planning Network, LLC v. SEC

# United States Court of Appeals
# for the Second Circuit

August Term, 2019

(Argued: June 2, 2020          Decided: June 26, 2020)

Docket Nos. 19-2886-ag(L), 19-2893-ag(CON)

_____

XY PLANNING NETWORK, LLC, FORD FINANCIAL SOLUTIONS, LLC,
STATE OF NEW YORK, STATE OF CALIFORNIA, STATE OF CONNECTICUT,
STATE OF DELAWARE, STATE OF MAINE, DISTRICT OF COLUMBIA, STATE
OF NEW MEXICO AND STATE OF OREGON,

*Petitioners*,

v.

UNITED STATES SECURITIES AND EXCHANGE COMMISSION, WALTER
CLAYTON, IN HIS OFFICIAL CAPACITY AS CHAIRMAN OF THE UNITED
STATES SECURITIES AND EXCHANGE COMMISSION,

*Respondents.*

_____

Before:

SULLIVAN, PARK, AND NARDINI, *Circuit Judges*.

In 2019, the Securities and Exchange Commission promulgated Regulation Best Interest, which creates new standards of conduct for broker-dealers providing investment services to retail customers. Petitioners XY Planning Network, LLC, Ford Financial Solutions, LLC, and a group of states and the District of Columbia filed petitions for review under the Administrative Procedure Act, 5 U.S.C. § 706(2), claiming that Regulation Best Interest is unlawful under the 2010 Dodd-Frank Wall Street Reform and Consumer Protection Act. We hold that: (1) Ford

Financial Solutions has Article III standing to bring its petition for review, (2) Section 913(f) of the Dodd-Frank Act authorizes Regulation Best Interest, and (3) Regulation Best Interest is not arbitrary and capricious.  **DENIED**.

Judge Sullivan concurs in part and dissents in part in a separate opinion.

DEEPAK GUPTA (Jonathan E. Taylor, Daniel Wilf-Townsend, *on the brief*), Gupta Wessler PLLC, Washington, DC, *for Petitioners XY Planning Network, LLC and Ford Financial Solutions, LLC.*

ESTER MURDUKHAYEVA (Attorney General Letitia James, Solicitor General Barbara D. Underwood, Steven C. Wu, Matthew Colangelo, Kevin Wallace, Jeffrey A. Novak, Rita Burghardt McDonough, Jonathan Zweig, *on the brief*), New York, NY, *for Petitioner State of New York.*

JEFFREY A. BERGER (Robert B. Stebbins, Michael A. Conley, Daniel E. Matro, *on the brief*), Washington, DC, *for Respondents United States Securities and Exchange Commission and Walter Clayton.*

Attorney General Xavier Becerra, Matthew Rodriguez, Martin Goyette, Amy Winn, Nathaniel R. Spencer-Mork, San Francisco, CA *for Petitioner State of California.*

Attorney General William Tong, Joseph J. Chambers, Hartford, CT, *for Petitioner State of Connecticut.*

Attorney General Kathleen Jennings, Marion Quirk, Joseph E. Gibbs-Tabler, Jillian Lazar, Wilmington, DE, *for Petitioner State of Delaware*.

Attorney General Aaron M. Frey, Gregg D. Bernstein, Augusta, ME, *for Petitioner State of Maine*.

Attorney General Hector Balderas, Nicholas M. Sydow, Tania Maestas, Santa Fe, NM, *for Petitioner State of New Mexico*.

Attorney General Karl A. Racine, Loren L. AliKhan, Jacqueline R. Bechara, Graham E. Phillips, Washington, DC, *for Petitioner District of Columbia*.

Attorney General Ellen F. Rosenblum, Brian A. de Haan, Portland, OR, *for Petitioner State of Oregon*.

Todd M. Galante, Piro Zinna Cifelli Paris & Genitempo, LLC, Nutley, NJ, *for Amicus Curiae Financial Planning Association in support of Petitioners*.

Brianne J. Gorod, Ashwin P. Phatak, Elizabeth B. Wydra, Clare E. Riva, Constitutional Accountability Center, Washington, DC, *for Amici Curiae Current and Former Members of Congress in support of Petitioners*.

Dennis M. Kelleher, Better Markets, Inc., Washington, DC, *for Amici Curiae Better*

3

*Markets, Inc. and the Consumer Federation of America in support of Petitioners.*

Adam J. Weinstein, Gana Weinstein LLP, New York, NY, *for Amicus Curiae The Public Investors Arbitration Bar Association in support of Petitioners.*

Jesse Panuccio, Jordan R. Goldberg, Boies Schiller Flexner LLP, Washington, DC, *for Amici Curiae Representatives Ann Wagner, Andy Barr, J. French Hill, Blaine Luetkemeyer, and Senator Tom Cotton in support of Respondents.*

Kelly P. Dunbar, Wilmer Cutler Pickering Hale and Dorr LLP, Washington, DC, *for Amici Curiae the Securities Industry and Financial Markets Association, the Chamber of Commerce of the United States of America, the American Council of Life Insurers, and the Financial Services Institute in support of Respondents*.

PARK, *Circuit Judge*:

Investment advisers and broker-dealers both offer financial services to retail customers. Under federal law, investment advisers owe a fiduciary duty to their clients, but broker-dealers do not. The traditional distinctions between the services offered by the two types of firms have blurred in recent decades, raising questions about this standard-of-care framework. As a result, in 2019, the

4

Securities and Exchange Commission ("SEC") adopted Regulation Best Interest, which imposes a new "best-interest obligation" on broker-dealers.

Petitioners—an organization of investment advisers, an individual investment adviser, seven states,[1] and the District of Columbia—now challenge Regulation Best Interest as unlawful under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2). They argue that the 2010 Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank Act") requires the SEC to adopt a rule holding broker-dealers to the same fiduciary standard as investment advisers. But Section 913(f) of the Dodd-Frank Act grants the SEC broad rulemaking authority, and Regulation Best Interest clearly falls within the discretion granted to the SEC by Congress. Although Regulation Best Interest may not be the policy that Petitioners would have preferred, it is what the SEC chose after a reasoned and lawful rulemaking process.

We thus hold that: (1) the individual investment-adviser petitioner has Article III standing to bring its petition for review, but the state petitioners do not; (2) Section 913(f) of the Dodd-Frank Act authorizes the SEC to promulgate

---

[1] California, Connecticut, Delaware, Maine, New Mexico, New York, and Oregon.

Regulation Best Interest; and (3) Regulation Best Interest is not arbitrary and capricious under the APA.

For these reasons, we deny the petitions for review.

# I. BACKGROUND

## A. Regulatory Background

Broker-dealers effect securities transactions for customers, for which they typically charge a commission or other transaction-based fee. *See* 15 U.S.C. §§ 78c(a)(4)(A) (defining brokers), 78c(a)(5)(A) (defining dealers). In connection with their services, broker-dealers often provide advice and make recommendations about securities transactions and investment strategies. When doing so, they are generally subject to a "suitability" standard of care, which arises from the federal securities laws, Financial Industry Regulatory Authority ("FINRA") rules, and SEC precedent. This standard requires broker-dealers to "have a reasonable basis to believe that a recommended transaction or investment strategy . . . is suitable for the customer." FINRA Rule 2111(a).

Investment advisers, on the other hand, provide advice and other discretionary services on an ongoing basis, for which they typically charge recurring fees based on a percentage of the assets they manage. Investment

advisers are regulated under the Investment Advisers Act of 1940 ("IAA") and owe a fiduciary duty to their clients. *See* 15 U.S.C. § 80b-2(a)(11)(C) (defining investment adviser); *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 194 (1963) (describing "an affirmative duty of utmost good faith, and full and fair disclosure of all material facts, as well as an affirmative obligation to employ reasonable care to avoid misleading . . . clients" (internal quotation marks omitted)). The IAA's definition of investment adviser has a "broker-dealer exemption," which excludes "any broker or dealer whose performance of such services is [1] solely incidental to the conduct of his business as a broker or dealer and [2] who receives no special compensation therefor." 15 U.S.C. § 80b-2(a)(11)(C). A business may register as both an investment adviser and a broker-dealer.[2]

**B. The Dodd-Frank Act**

In 2010, Congress authorized the SEC to promulgate new standards of conduct for broker-dealers and investment advisers under the Dodd-Frank Act,

---

[2] Although in theory broker-dealers and investment advisers "play distinct roles," "in practice, trends in financial services markets since [at least] the early 1990s have blurred the boundaries between these financial professionals." Brian Scholl et al., SEC Office of the Investor Advocate & RAND Corp., *The Retail Market for Investment Advice* ("*RAND study*") 4 (2018), *available at* https://www.sec.gov/comments/s7-07-18/s70718-4513005-176009.pdf.

Pub. L. No. 111-203, § 913, 124 Stat. 1376, 1824–30. Section 913(b) of the Dodd-Frank Act directed the SEC to study "the standards of care for brokers, dealers, [and] investment advisers." *Id*. at 1824–25. Sections 913(f) and (g), the main provisions at issue here, concern the SEC's rulemaking authority.

Section 913(f) states that the SEC "may commence a rulemaking, as necessary or appropriate in the public interest and for the protection of retail customers . . . to address the legal or regulatory standards of care for brokers, dealers, [and] investment advisers." *Id*. at 1827. In doing so, the SEC "shall consider the findings[,] conclusions, and recommendations" of the Section 913(b) study. *Id.* at 1828.

Section 913(g)(1) states that the SEC "may promulgate rules to provide that, with respect to [broker-dealers], when providing personalized investment advice about securities to a retail customer[,] . . . the standard of conduct for such [broker-dealers] . . . shall be the same as the standard of conduct applicable to an investment adviser . . . ." *Id*. Section 913(g)(2) provides that the SEC "may promulgate rules to provide that the standard of conduct for all brokers, dealers, and investment advisers, when providing personalized investment advice about securities to retail customers[,] . . . shall be to act in the best interest of the customer

8

without regard to the financial or other interest of the broker, dealer or investment adviser providing the advice . . . . [S]uch standard of conduct shall be no less stringent than the standard applicable to investment advisers under [the IAA]."  *Id.*

In 2011, SEC staff issued the Section 913(b) study and recommended that the SEC adopt a "uniform fiduciary standard . . . regardless of the regulatory label (broker-dealer or investment adviser) of the professional providing the advice."  App'x at 328.

**C.    Regulation Best Interest**

In June 2019, the SEC adopted Regulation Best Interest, which establishes a new standard of care for broker-dealers serving retail customers.[3] *Regulation Best Interest*, 17 C.F.R. § 240.15*l*-1 (2019).  Specifically, Regulation Best Interest imposes a "best-interest obligation" on broker-dealers, requiring them to "act in the best interest of the retail customer at the time the recommendation is made, without placing the financial or other interest of the [broker-dealer] . . . ahead of the interest of the retail customer."  *Id*.  The best-interest obligation has four components: (1) a "disclosure obligation," requiring broker-dealers to disclose any material facts

---

[3] Retail customers are individuals who "receive[] personalized investment advice . . . primarily for personal, family, or household purposes."  124 Stat. at 1824.

relating to the scope and terms of the relationship with the customer, as well as all material conflicts of interest related to their investment recommendations; (2) a "care obligation," requiring broker-dealers to "[h]ave a reasonable basis to believe that the recommendation is in the best interest of" the customer; (3) a "conflict of interest obligation," requiring broker-dealers to identify, mitigate, and disclose conflicts of interest and to "[p]revent" conflicts that would cause them to "make recommendation[s] that place [their own] interest ahead of the" customers'; and (4) a "compliance obligation" requiring broker-dealers to adopt policies and practices "reasonably designed to achieve compliance with Regulation Best Interest." *Id*.

The SEC proposed an initial version of the rule in 2018, and after an extensive notice-and-comment process, it adopted a final version of Regulation Best Interest, along with an interpretive rule clarifying the meaning of "solely incidental" in the broker-dealer exemption to the IAA.  Notice of Proposed Rulemaking, *Regulation Best Interest*, 83 Fed. Reg. 21,574 (May 9, 2018); *Commission Interpretation Regarding the Solely Incidental Prong of the Broker-Dealer Exclusion from the Definition of Investment Adviser* ("*Solely Incidental Interpretation*"), 84 Fed. Reg. 33,681 (July 12, 2019).  During the comment period, the SEC received "over 6,000

comment letters" from individual investors, trade groups, and financial firms, and held a series of "investor roundtables" to solicit in-person feedback on the proposed rule. *Regulation Best Interest: The Broker-Dealer Standard of Conduct* ("Adopting Release"), 84 Fed. Reg. 33,318, 33,320.

The SEC responded to these comments in a 173-page Adopting Release explaining why it chose the best-interest standard. *Id*. at 33,318–33,491. It considered and rejected a uniform fiduciary standard for investment advisers and broker-dealers, explaining that "a 'one size fits all' approach would risk reducing investor choice" and that a uniform fiduciary standard "would [not] provide any greater investor protection (or, in any case, that any benefits would [not] justify the costs imposed on retail investors in terms of reduced access to services . . .)." *Id*. at 33,322. The Adopting Release also explicitly noted that the SEC was relying on Section 913(f)'s broad grant of rulemaking authority to promulgate Regulation Best Interest. *Id*. at 33,330.

**D.     Petitioners**

Two groups of petitioners brought suit claiming that Regulation Best Interest is unlawful: (1) an investment-adviser interest group, XY Planning Network, LLC, and one of its members, Ford Financial Solutions, LLC (together,

11

"XYPN"); and (2) a group of states and the District of Columbia (collectively, "State Petitioners").

XYPN contends that Regulation Best Interest will injure investment advisers by making it more difficult for them to differentiate their standard of care from that of broker-dealers in advertising to attract customers. Julie Ford, owner of Ford Financial Solutions, LLC (together, "Ford"), attests that Ford "currently attract[s] and retain[s] clients by, in part, highlighting [the] firm's fiduciary duty to clients," in contrast to the less stringent suitability standard governing broker-dealers. XYPN Add. at 5. Ford claims that under Regulation Best Interest, broker-dealers will be able to advertise that they must act in their clients' "best interests" just as Ford does, even though they will face "comparatively fewer regulatory obligations, lower compliance costs, and less legal exposure." *Id.*

The State Petitioners claim that Regulation Best Interest will diminish their tax revenues from investment income by allowing broker-dealers to provide conflicted investment advice to customers, which would be prohibited under a uniform fiduciary standard. The State Petitioners cite expert evidence claiming that "[t]he loss of retail investment returns due to conflicted financial advice causes harm to states by lowering their tax revenues." States' Add. at 6.

## III. DISCUSSION

**A. Article III Standing**

As an initial matter, the SEC argues that Petitioners lack Article III standing to challenge Regulation Best Interest. We conclude that Ford has standing to bring its petition based on the impairment of its current ability to attract customers by touting the fiduciary duties it owes its clients. In other words, by enabling broker-dealers to advertise their new best-interest obligation, Regulation Best Interest will put Ford and other investment advisers at a competitive disadvantage compared to the status quo. The State Petitioners, on the other hand, lack Article III standing because their claim that Regulation Best Interest will cause a decline in state revenue is entirely speculative.

To show Article III standing, Petitioners "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). "The petitioner's burden of production . . . is . . . the same as that of a plaintiff moving for summary judgment[:] . . . it must support each element of its claim to standing 'by affidavit or other evidence.'"

13

*Sierra Club v. EPA*, 292 F.3d 895, 899 (D.C. Cir. 2002) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

1. Ford's Standing

Ford has established Article III standing under the "well-established concept of competitors' standing." *Schulz v. Williams*, 44 F.3d 48, 53 (2d Cir. 1994). This doctrine recognizes "that economic actors 'suffer an injury in fact when agencies . . . allow increased competition' against them." *Sherley v. Sebelius*, 610 F.3d 69, 72 (D.C. Cir. 2010) (cleaned up). Ford meets this standard because its principal attests that Regulation Best Interest will impair its ability to differentiate its services from broker-dealers' based on its higher duty of care.[4]

A party has standing to sue over a regulation that unlawfully "bestows upon their competitors 'some competitive advantage.'" *Citizens for Responsibility & Ethics in Wash. v. Trump* ("CREW"), 953 F.3d 178, 190 (2d Cir. 2019) (quoting *Fulani v. League of Women Voters Educ. Fund*, 882 F.2d 621, 626 (2d Cir. 1989)).[5] The "basic requirement" of competitor standing is that "the complainant show an

---

[4] Because Ford has standing, we need not address XYPN's argument that the organization itself may sue on behalf of its investment-adviser members or that Regulation Best Interest will deter firms from registering as investment advisers and joining XYPN as dues-paying members.

[5] Petitioners also must show "that they personally compete in the same arena as the unlawfully benefited competitor," which is undisputed here. *CREW*, 953 F.3d at 190 (cleaned up).

14

actual or imminent increase in competition." *Am. Inst. of Certified Pub. Accountants v. IRS*, 804 F.3d 1193, 1197 (D.C. Cir. 2015) (citation omitted). The party suing need not "identify specific customers who switched to [its] competitors" as long as the allegedly unlawful regulation "increases competition or aids the plaintiff's competitors." *CREW*, 953 F.3d at 190 (quoting *Canadian Lumber Trade All. v. United States*, 517 F.3d 1319, 1332 (Fed. Cir. 2008)). "The form of [this] injury may vary; for example, a seller facing increased competition may lose sales to rivals, or be forced to lower its price or to expend more resources to achieve the same sales, all to the detriment of its bottom line." *Sherley*, 610 F.3d at 72.

Here, Ford currently attracts customers by "highlighting [the] firm's fiduciary duty to clients"—one of the firm's "hallmarks"—in contrast to the lower standard of suitability owed by broker-dealers. XYPN Add. at 4–5. Ford states that Regulation Best Interest will create "a significant risk that clients will not be able to effectively differentiate the fiduciary duty that [Ford] owe[s] them from the lower duty that broker-dealers owe their clients," which will "harm [Ford's] ability to attract customers through . . . highlighting the increased standard of loyalty and care" that it owes to its clients. *Id*. at 5; *see also* Angela A. Hung et al., RAND Corp., *Investor Testing of Form CRS Relationship Summary* 46–48 (2018) (discussing

evidence of consumer confusion), *available at* https://www.sec.gov/about/offices/investorad/investor-testing-form-crs-relationship-summary.pdf.

Because Ford has identified an impairment to a specific business practice, it has made a "concrete showing that it is in fact likely to suffer financial injury" from Regulation Best Interest. *KERM, Inc. v. FCC*, 353 F.3d 57, 60 (D.C. Cir. 2004). The harm to Ford's "ability to attract customers" by "highlighting [its] fiduciary duty to clients," XYPN Add. at 5, means that it will "be forced to lower its price[s] or to expend more resources to achieve the same sales, all to the detriment of its bottom line."[6] *Sherley*, 610 F.3d at 72. Thus, Ford has shown, based on both "economic logic" and "actual market experience," that Regulation Best Interest will hurt its business. *Canadian Lumber*, 517 F.3d at 1333 (citation omitted). This is enough for competitor standing here.

---

[6] Ford's claim is distinguishable from cases involving more "speculative" attempts to "challenge a regulation that merely imposes enhanced regulatory burdens on [a] competitor" because Ford has identified a specific harm to its ability to attract customers. *See, e.g., State Nat'l Bank of Big Spring v. Lew*, 795 F.3d 48, 55 (D.C. Cir. 2015) (holding that a plaintiff could not sue over a regulation that imposed a "*greater* regulatory burden" on its competitors because the harm identified—the "reputational benefit" conferred on the competitor—was "simply too attenuated and speculative to show the causation necessary to support standing"). To be sure, Ford also states that its broker-dealer competitors will be subject to "comparatively fewer regulatory obligations, lower compliance costs, and less legal exposure," XYPN Add. at 5, but that is not the basis on which we conclude that Ford has standing.

## 2. State Petitioners' Standing

Unlike Ford, the State Petitioners do not have Article III standing because they have failed to establish a direct link between Regulation Best Interest and their tax revenues. A state has Article III standing to challenge a federal regulation if it can show "a direct injury in the form of a loss of specific tax revenues." *Wyoming v. Oklahoma*, 502 U.S. 437, 448 (1992); *accord Wyoming v. U.S. Dep't of Interior*, 674 F.3d 1220, 1232 (10th Cir. 2012). A "fairly direct link" is required because "the unavoidable economic repercussions of virtually all federal policies . . . suggest to us that impairment of state tax revenues should not, in general, be recognized as sufficient injury in fact to support state standing." *Pennsylvania v. Kleppe*, 533 F.2d 668, 672 (D.C. Cir. 1976).

Here, the State Petitioners have not shown a direct link between Regulation Best Interest and their tax revenues, relying instead on a causal chain that is too attenuated and speculative to support standing. Even assuming the State Petitioners are correct that Regulation Best Interest will allow for more conflicted advice than a uniform fiduciary standard would, and that such conflicted advice would lead to lower returns on certain investments, the State Petitioners' theory of injury further depends on even more assumptions to arrive at a "concrete and

17

particularized" harm to the State Petitioners' budgets, as opposed to one that is "conjectural or hypothetical." *Spokeo*, 136 S. Ct. at 1548 (citation omitted).

The ultimate annual pool of taxable capital gains in a state is driven by countless variables, from the performance of the broader economy to the composition of individual investor portfolios in the state. The State Petitioners' theory also assumes away the potential downsides of a uniform fiduciary standard, such as investor losses due to higher costs and reduced consumer choice if broker-dealers are driven from the marketplace for investment advice. As a result, we find that the State Petitioners' theory of injury rests too heavily on "conclusory statements and speculative economic data" concerning the long-term effects of Regulation Best Interest on state budgets, *Wyoming*, 674 F.3d at 1232–33, and we thus conclude that the State Petitioners lack Article III standing.

Nonetheless, because Ford has standing, we have jurisdiction to proceed to the merits of the petitions for review. *See Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1651 (2017) ("At least one plaintiff must have standing to seek each form of relief requested . . . .").

**B.      Legality under the Dodd-Frank Act**

The Dodd-Frank Act authorizes the SEC to promulgate Regulation Best Interest. Congress stated that the SEC "*may* commence a rulemaking, as necessary or appropriate in the public interest and for the protection of retail customers . . . to address the legal or regulatory standards of care for" broker-dealers. Dodd-Frank Act § 913(f) (emphasis added). This broad grant of permissive rulemaking authority encompasses the best-interest rule adopted by the SEC. Contrary to Petitioners' argument, Section 913(g) does not narrow the scope of Section 913(f) but rather provides a separate grant of rulemaking authority.

The key language in each of the provisions at issue is "may," which is permissive and reflects Congress's grant of discretionary rulemaking authority to the SEC. *See id.* § 913(f) ("The Commission may commence a rulemaking . . ."); *id.* § 913(g)(1) ("the Commission may promulgate rules . . ."); *id.* § 913(g)(2) ("The Commission may promulgate rules . . ."). Congress gave the SEC the authority to promulgate rules under any of these sections—or to make no rule at all. With Regulation Best Interest, the SEC chose to proceed under Section 913(f), not Sections 913(g)(1) or (g)(2).

19

In addition to the word "may," the permissive nature of Congress's grant of authority in Section 913(f) is reinforced by discretionary language allowing the SEC to act "*as necessary or appropriate* in the public interest . . . [to] *address* the legal or regulatory standards of care . . . ." *Id.* § 913(f) (emphases added). Congress delegated to the SEC broad, discretionary authority, which the SEC lawfully exercised by promulgating Regulation Best Interest.

Petitioners contend that this reading of Section 913(f) would render the narrower authorizations in Section 913(g) superfluous. Although there is some "[o]verlap" among the three provisions, Section 913(g) is not superfluous because it clarifies that the SEC could have promulgated a uniform fiduciary standard. *See Skilling v. United States*, 561 U.S. 358, 413 n.45 (2010) ("Overlap with other federal statutes does not render [a statutory provision] superfluous.").

In 2007, the D.C. Circuit struck down an SEC rule broadening the exemption for broker-dealers under the IAA. *Fin. Planning Ass'n v. SEC*, 482 F.3d 481, 488 (D.C. Cir. 2007). When Congress was debating the Dodd-Frank Act, commentators expressed concern that the courts might similarly strike down any new SEC regulation that subjected broker-dealers to the same fiduciary standard

that is applicable to investment advisers.[7] By including Section 913(g), Congress ensured that the SEC had explicit (but discretionary) authorization to create a standard of conduct for broker-dealers that is the "same as the standard of conduct applicable to an investment adviser" or to require that both broker-dealers and investment advisers act in the "best interest of the [retail] customer without regard to the financial or other interest of the broker, dealer, or investment adviser." Dodd-Frank Act § 913(g). So even if Section 913(g) provides no additional grant of authority beyond Section 913(f), it does "a small amount of additional work" by clarifying that the IAA's broker-dealer exemption did not prevent the SEC from imposing a fiduciary obligation on broker-dealers if it so chose. *Scheidler v. Nat'l Org. for Women, Inc.*, 547 U.S. 9, 22 (2006).[8]

---

[7] *See, e.g.*, *Enhancing Investor Protection and the Regulation of Securities Markets: Hearing Before the S. Comm. on Banking, Housing, and Urban Affairs*, 111th Cong. 136 (2009) (statement of Damon A. Silvers, Associate General Counsel, AFL-CIO) ("[P]art of what must be done in this area is to determine whether the proper regulatory approach will require Congressional action in light of the D.C. Circuit opinion.").

[8] Although "reliance on legislative history is unnecessary in light of the statute's unambiguous language," *Mohamad v. Palestinian Auth.*, 566 U.S. 449, 458 (2012) (citation omitted), the context of the Dodd-Frank Act supports this conclusion. The House and Senate versions of the bill each granted the SEC rulemaking authority over standards of care, but in different ways. *See* Br. of Amici Curiae Representative Ann Wagner et al. at 21–26 (discussing legislative history). The House bill contained a mandatory version of Section 913(g), requiring that the SEC "shall promulgate rules" making the standard of conduct for broker-dealers and investment advisers "the same." H.R. 4173, § 7103, 111th Cong. (as passed by the House, Dec. 11, 2009). The Senate bill, however, more closely resembled Section 913(f), stating that if the SEC found regulatory

Petitioners propose their own interpretation of Section 913—that Section 913(f) is a procedural authorization to commence rulemaking only and that Section 913(g) provides the substantive content for any such rulemaking. But this reading is inconsistent with the plain meaning of the text, which specifies that the rulemaking should "address the legal or regulatory standards of care for brokers, dealers, [and] investment advisers . . . ." Section 913(f). Petitioners' approach would render meaningless the substantive portions of Section 913(f) that follow the broad grant of rulemaking authority.

We thus hold that the SEC lawfully promulgated Regulation Best Interest pursuant to Congress's permissive grant of rulemaking authority under Section 913(f) of the Dodd-Frank Act.

**C.  Arbitrary and Capricious Review**

Finally, Petitioners contend that Regulation Best Interest is arbitrary and capricious because (1) it relies on an incorrect interpretation of the broker-dealer

---

"gaps or overlap," it "shall . . . commence a rulemaking, as necessary or appropriate in the public interest and for the protection of retail customers, to address such regulatory gaps and overlap." S. 3217, § 913(f)(1), 111th Cong. (as amended by the Senate, May 20, 2010). The final bill retained both the House and Senate language as Sections 913(g) and (f), respectively, but substituted the word "may" for the word "shall" to indicate that the SEC had the option, but not the obligation, to make rules under each provision. 124 Stat. at 1827–29. The independent origins of Sections 913(f) and (g) thus support the interpretation that they are freestanding grants of rulemaking authority, not interdependent provisions that limit one another.

exemption to the IAA, and (2) the SEC did not adequately address evidence of consumer confusion. We reject both arguments and hold that Regulation Best Interest is not arbitrary and capricious.

"[W]e will set aside the agency's decision only if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Nat. Res. Def. Council, Inc. v. FAA*, 564 F.3d 549, 555 (2d Cir. 2009) (internal quotation marks omitted). "Under this deferential standard of review, we may not substitute our judgment for that of the agency," and we "must be reluctant to reverse results supported by a weight of considered and carefully articulated expert opinion." *Cty. of Westchester v. U.S. Dep't of Housing & Urban Dev.*, 802 F.3d 413, 430–31 (2d Cir. 2015) (internal quotation marks omitted).

The SEC "crafted Regulation Best Interest to draw on key principles underlying fiduciary obligations . . . while providing specific requirements to address certain aspects of the relationships between broker-dealers and their retail customers." 84 Fed. Reg. at 33,320. It considered several thousand comments, explicitly rejected proposed alternatives, and concluded that the best-interest obligation "will best achieve the [SEC's] important goals of enhancing retail investor protection and decision making, while preserving, to the extent possible,

23

retail investor access (in terms of choice and cost) to differing types of investment services." *Id*. at 33,320–23.

At bottom, Petitioners' preference for a uniform fiduciary standard instead of a best-interest obligation is a policy quarrel dressed up as an APA claim. The SEC carefully considered and rejected a fiduciary rule based on its findings that the fiduciary duties owed by investment advisers are "not appropriately tailored to the structure and characteristics of the broker-dealer business model (*i.e.*, transaction-specific recommendations and compensation)." 84 Fed. Reg. at 33,322. "For example, an investment adviser's fiduciary duty generally includes a duty to provide ongoing advice and monitoring, while Regulation Best Interest imposes no such duty and instead requires that a broker-dealer act in the retail customer's best interest *at the time* a recommendation is made." *Id.* at 33,321 (footnote omitted). We are "reluctant to reverse" such a "considered and carefully articulated" policy decision. *Cty. of Westchester*, 802 F.3d at 431 (citation omitted).

1. Interpretation of the Broker-Dealer Exemption

Petitioners claim that Regulation Best Interest is arbitrary and capricious because it is based on an incorrect interpretation of the "solely incidental" and "special compensation" prongs of the broker-dealer exemption from the IAA. *See*

24

15 U.S.C. § 80b-2(a)(11)(C) (exempting from the definition of investment adviser "any broker or dealer whose performance of such services is [1] solely incidental to the conduct of his business as a broker or dealer and [2] who receives no special compensation therefor"); *Prill v. NLRB*, 755 F.2d 941, 948 (D.C. Cir. 1985) ("If a regulation is based on an incorrect view of applicable law, the regulation cannot stand as promulgated." (citation omitted)).

We conclude that the SEC's interpretation of the scope of the broker-dealer exemption is not so "fundamental" to Regulation Best Interest as to make the rule "arbitrary, capricious, or otherwise not in accordance with law." *Safe Air for Everyone v. EPA*, 488 F.3d 1088, 1101 (9th Cir. 2007) (citation omitted). The SEC issued an interpretative rule on the phrase "solely incidental" along with Regulation Best Interest. *Solely Incidental Interpretation*, 84 Fed. Reg. 33,681. But Petitioners have not challenged that rule, nor do they argue that they are permitted to do so.[9] And the phrase "special compensation" is not even mentioned in Regulation Best Interest or the adopting release. *See generally Regulation Best Interest*, 84 Fed. Reg. 33,318. Petitioners thus fail to explain how the SEC's

---

[9] We reject Petitioners' contention that Regulation Best Interest fundamentally relies on the Solely Incidental Interpretation. The Adopting Release contains only a few passing references to the Interpretation for the limited purpose of providing regulatory context. *See, e.g.*, 84 Fed. Reg. at 33,321, 33,336 n.166.

25

interpretation of the broker-dealer exemption to the IAA could make Regulation Best Interest arbitrary and capricious.

### 2. Consideration of Evidence of Consumer Confusion

Petitioners also argue that Regulation Best Interest is arbitrary and capricious because the SEC failed adequately to address the "significant evidence that consumers are not meaningfully able to differentiate between the standards of conduct owed by broker-dealers and investment advisers even with the assistance of disclosure forms."[10] XYPN Br. at 53 (citing, *inter alia*, *RAND Study* at 13). But the SEC considered evidence of consumer confusion and found that the benefits of decreased costs and consumer choice favored adopting the best-interest obligation. This decision was not arbitrary and capricious.

"When a petitioner challenges the procedure by which an agency engaged in rulemaking, . . . we defer to [the] agency's determinations so long as the agency 'gives adequate reasons for its decisions,' in the form of a 'satisfactory explanation

---

[10] The State Petitioners also assert that the SEC provided inadequate economic analysis, but the cases they cite require the agency to give only a "reasoned explanation" for its decision, not necessarily a quantitative one. *See, e.g.*, *City of Brookings Mun. Tel. Co. v. FCC*, 822 F.2d 1153, 1169 & n.46 (D.C. Cir. 1987); *accord Defenders of Wildlife v. Zinke*, 856 F.3d 1248, 1263–64 (9th Cir. 2017) (rejecting the claim that an agency's "failure to quantify" some of the effects of its decision made that decision "arbitrary and capricious"); *Lindeen v. SEC*, 825 F.3d 646, 658 (D.C. Cir. 2016) ("We do not require the [SEC] 'to measure the immeasurable' and we do not require it to 'conduct a rigorous, quantitative economic analysis unless the statute explicitly directs it to do so.'" (citation omitted)).

for its action including a rational connection between the facts found and the choice made.'" *Nat. Res. Def. Council, Inc. v. EPA* ("*NRDC*"), 961 F.3d 160, 170 (2d Cir. 2020) (cleaned up) (quoting *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016)). "An agency's factual findings must be supported by 'substantial evidence,'" meaning "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Fund for Animals v. Kempthorne*, 538 F.3d 124, 132 (2d Cir. 2008) (citations omitted).

In the Adopting Release, the SEC explicitly recognized that a uniform standard of care may "reduce retail investor confusion as it would ensure that investors are provided the same standard of care and loyalty regardless of what type of financial professional they engage." 84 Fed. Reg. at 33,462. But the SEC weighed these benefits against the "significant compliance costs" for broker-dealers that could cause "retail customers [to] experience an increase in the cost of obtaining investment advice" and lead to "the potential exit of broker-dealers from the market." *Id*. at 33,462; *id*. at 33,464 n.1351 (citing Vivek Bhattacharya et al., *Fiduciary Duty and the Market for Financial Advice* (Working Paper, Apr. 2019) (discussing possible exit by broker-dealers)); 84 Fed. Reg. at 33,464 n.1354 (citing Diane Del Guercio & Jonathan Reuter, *Mutual Fund Performance and the Incentive to*

*Generate Alpha*, 69 J. Fin. 1673, 1682 (2014) (discussing the lower costs offered by broker-dealers)); *see also* Br. for Amici Curiae SIFMA et al. in support of Respondents at 14–20 (surveying evidence in support of the SEC's analysis).

Thus, Regulation Best Interest was not arbitrary and capricious because the SEC gave "adequate reasons for its decision[]" to prioritize consumer choice and affordability over the possibility of reducing consumer confusion, and it supported its findings with "substantial evidence." *NRDC*, 961 F.3d at 170 (citation omitted); *Fund for Animals*, 538 F.3d at 132 (citation omitted).

## IV. CONCLUSION

For the reasons set forth above, the petitions for review are denied.

RICHARD J. SULLIVAN, *Circuit Judge*, concurring in part and dissenting in part:

I agree with the majority that the State Petitioners lack standing to bring their petition. I also happen to agree with the majority's analysis of Regulation Best Interest and its rejection of the investment advisers' challenge on the merits. Nevertheless, because I am convinced that XY Planning Network, LLC and Ford Financial Solutions, LLC (together, the "XYPN Petitioners") also lack standing to challenge Regulation Best Interest, I would dismiss the petitions in their entirety, without reaching the merits of petitioners' regulatory arguments.

In order to establish Article III standing, petitioners "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). The XYPN Petitioners offer a grab bag of standing theories, most of which are easily brushed aside for failing to establish one or more of the three requirements articulated in *Spokeo*.

For example, Ford asserts that it has standing to challenge Regulation Best Interest because the rule will subject Ford's broker-dealer competitors to "comparatively fewer regulatory obligations, lower compliance costs, and less legal exposure, giving them a competitive advantage." XYPN Br. Add. at 5. But

Ford cannot establish that Regulation Best Interest is the *cause* of these alleged injuries, since the XYPN Petitioners concede that the competitive imbalance between investment advisers and broker-dealers predated the rule. *See* XYPN Br. at 11 (explaining the "reality of the retail market for investment advice, in which broker-dealers . . . regularly provide personalized financial advice alongside investment advisers without registering themselves under the Investment Advisers Act"); *id.* at 17 (acknowledging that Regulation Best Interest "preserved the regulatory gap between broker-dealers and investment advisers in the market for personalized investment advice"). If anything, Regulation Best Interest will actually lessen the competitive disadvantage faced by investment advisers since it in fact *increases* the regulatory obligations, compliance costs, and legal exposure borne by broker-dealers. So even if Ford is correct in asserting that it remains at a disadvantage because the SEC did not equalize the duties and obligations of investment advisers and broker-dealers, that injury "cannot tenably trace" to Regulation Best Interest. *Cal. Ass'n of Physically Handicapped, Inc. v. FCC*, 778 F.2d 823, 827 (D.C. Cir. 1985). Moreover, a favorable judicial decision in this action would not redress the investment advisers' alleged injuries, since vacatur of the regulation would restore the status quo, leaving broker-dealers with even fewer

2

obligations and a more pronounced competitive advantage over investment advisers.

For its part, XY Planning contends that it has standing because the rule's failure to impose a uniform fiduciary standard on both broker-dealers and investment advisers "reduces the likelihood that broker-dealers will register as investment advisers," thereby "resulting in a loss of business" from broker-dealers who might otherwise be induced to join XY Planning as dues-paying members. XYPN Br. at 31. But in addition to being wholly speculative, this theory again fails to establish a causal relationship between the regulation and the alleged injury. At bottom, XY Planning does not claim that Regulation Best Interest will cause it to lose business; it merely complains that the rule does not do more to mitigate a preexisting competitive injury. But that is not enough to establish injury-in-fact or causation. And since the SEC is under no statutory mandate to impose an equalizing fiduciary standard on broker-dealers, a favorable result in this litigation – vacatur of Regulation Best Interest – will do nothing to redress that preexisting harm. To the contrary, vacatur will ensure that broker-dealers continue to enjoy a more pronounced competitive advantage – and have even less incentive to join XY

Planning as dues-paying members – than would be the case under Regulation Best Interest.

Notwithstanding the inadequacies of the XYPN Petitioners' principal standing arguments, the majority purports to find a winning theory of standing at the very bottom of the bag. That theory – which might be characterized as "the client marketing theory" – posits that Ford and similarly situated investment advisers meet the requirements of *Spokeo* because "Regulation Best Interest will impair [Ford's] ability to differentiate its services from broker-dealers' based on its higher duty of care." Maj. Op. at 14. Accepting at face value the affidavit of Ford's principal, the majority concludes that (1) Ford attracts customers by touting its fiduciary duty to clients, in contrast to the lower suitability standard that broker-dealers owe to their clients, and (2) Regulation Best Interest poses "a significant risk that clients will not be able to effectively differentiate the fiduciary duty that [Ford] owe[s] them from the lower duty that broker-dealers owe their clients." *Id.* at 15 (internal quotation marks omitted). According to the majority, Regulation Best Interest threatens to impair Ford's ability to market its higher fiduciary duty as a way of differentiating itself from broker-dealer competitors. Put another way, the majority concludes that Ford uses this tactic to attract customers, but will no

4

longer be able to do so if broker-dealers can advertise that they too must act in their customers' "best interests" by virtue of the new regulation.

But surely more is required to establish an injury-in-fact for standing purposes. Under this theory, anyone would be able to challenge a regulation that imposes duties on third parties simply because the challenger chose to adopt a marketing strategy that made reference to the existence or non-existence of such regulations. Consider, for example, a not-far-fetched scenario involving the Food and Drug Administration's ("FDA") food labeling requirements. Under current regulations, food manufacturers are required to list the ingredients and pertinent nutritional information on the labels of their products. However, the FDA exempts small manufacturers from complying with those requirements so long as fewer than 100,000 units of a product are sold annually in the United States and the manufacturer employs fewer than 100 people. 21 C.F.R. § 101.9(j)(18). Imagine that a major food brand launched an ad campaign designed to increase its market share at the expense of small food manufacturers by highlighting its obligation to post ingredients on its labels ("read all about it") in contrast to the exemptions that allow gourmet food shops to stay silent ("who knows?"). If the FDA proposed a regulation change that would lift the labeling exemptions on small manufacturers,

5

would the major food brand have standing to challenge the new regulation merely because its catchy ad campaign would no longer be relevant?

To my mind, the impairment of a marketing tactic based on a competitor's characterization of government regulations simply cannot rise to the level of a legally cognizable injury-in-fact for standing purposes. As the Supreme Court has recognized, where a party is not "the object of the [challenged] government action," its standing is "substantially more difficult" to establish. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992) (internal quotation marks omitted). In those circumstances, "much more is needed," *id.*, namely, a "concrete, particularized, and actual or imminent" injury, *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (internal quotation marks omitted).

Here, Ford's diminished ability to market its fiduciary duty as a differentiating factor from its broker-dealer competitors does not satisfy this requirement. Neither the hypothetical food brand nor the actual petitioners here have a property interest in characterizing competitors as un- or under-regulated. And while they may have a limited First Amendment right to make such statements in the marketplace, they certainly don't have Article III standing to

6

challenge a regulation simply because it threatens to alter the regulatory status quo and render their marketing strategy less compelling.

For all these reasons, I am convinced that the XPYN Petitioners lack standing to challenge Regulation Best Interest, and that we are compelled to dismiss their petitions outright without reaching the merits of the challenge.